# Buffalo Branch, Mutual Film Corporation, Appellant, *v.* Breitinger.

*Constitutional law—Police power—Constitution of the United States—Fourteenth amendment—Constitution of Pennsylvania— Moving pictures—State Board of Censors—Act of June 19, 1911, P. L. 1067.*

1. Nothing but a clear violation of the Constitution—a clear usurpation of power prohibited—will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void.

2. The police power of the Commonwealth extends to all regulations affecting the health, good order, morals, peace and safety of society, and under it all sorts of restrictions and burdens may be imposed, and when they are not in conflict with any constitutional principles, they cannot be successfully assailed in a judicial tribunal.

3. The Act of June 19, 1911, P. L. 1067, providing for the appointment of a State Board of Censors to regulate the operation and exhibition of moving picture films, is constitutional. It is not in violation of the Bill of Rights of the Constitution of Pennsylvania, or of the Fourteenth Amendment of the Constitution of the United States.

Argued March 29, 1915.   Appeals, Nos. 45, 46 and 47, January T., 1915, by plaintiffs, from decrees of C. P. No. 5, Philadelphia Co., June T., 1914, Nos. 629, 630 and 631, refusing an injunction, in cases of Buffalo Branch, Mutual Film Corporation; and Mutual Film Corporation of Pennsylvania and Interstate Films Company v. J. Louis Breitinger, chief censor, and E. C. Niver, assistant censor, constituting the State Board of Censors; and Albert E. Brown, William Sachsenmaier, and Vernon R. Carrick, trading as the Overbrook Theatre, v.

J. Louis Breitinger, chief censor, and E. C. Niver, assistant censor, constituting the State Board of Censors. Before MESTREZAT, POTTER, ELKIN, MOSCHZISKER and FRAZER, JJ. Affirmed.

Bill in equity to enjoin defendants from enforcing the provisions of the Act of June 19, 1911, P. L. 1067.

On motion for a preliminary injunction, MARTIN, P. J., filed the following opinion:

Four separate bills in equity were filed against J. Louis Breitinger, chief censor, and E. C. Niver, assistant censor, constituting the State Board of Censors. The Buffalo Branch Mutual Film Corporation is a New York corporation, with its principal place of business in the City of Buffalo, and doing business in Pennsylvania. The Mutual Film Corporation of Pennsylvania is a Pennsylvania corporation, and the Interstate Films Company is a New Jersey corporation, with its principal place of businesss in Philadelphia. The Pittsburgh Photo Play Company is a Pennsylvania corporation, with its principal place of business in Pittsburgh. Albert E. Brown, William Sachsenmaier and Vernon R. Carrick are copartners, trading as the "Overbrook Theatre."

The bills filed by these corporation plaintiffs are substantially similar in terms, and aver that an Act of Assembly of the Commonwealth of Pennsylvania was approved June 19, 1911, P. L. 1067, pursuant to the directions of which the governor appointed the defendants, J. Louis Breitinger, chief censor, and E. C. Niver, assistant censor, to constitute the State Board of Censors, and that they have entered upon their duties. The bills allege that the act of assembly and the appointments are unconstitutional and void; that plaintiffs are engaged in the business of operating motion-picture film exchanges, and sell and rent films or reels in the State of Pennsylvania to motion-picture exhibitors, and have invested large sums of money in the business; that none

of the films or reels rented, or intended to be rented, are
sacrilegious, obscene, indecent, immoral or such as tend
to corrupt morals; that defendants published a pam-
phlet of rules and standards adopted by the board, which
was issued on or about April 25th, and came into the
hands of plaintiffs on or about May 10, 1914; that the
films owned by plaintiffs and rented in Pennsylvania are
produced in other states of the Union and shipped in
interstate commerce, and rented and received by lessees
for exhibition purposes; that the act is in violation of
Section 1, Article XIV, of the Constitution of the United
States, in that it abridges plaintiffs' right in the trans-
action of business with citizens of states other than
Pennsylvania; that it is arbitrary and inflicts a tax and
burden on plaintiffs which is unlawful and contrary to
the provisions of the Constitution of Pennsylvania; that
the fees provided in it are exorbitant; that it is in con-
travention of the Constitution of the United States and
of the Constitution of the Commonwealth of Pennsyl-
vania, in that plaintiffs are subjected to the arbitrary
action of defendants, from which there is no provision
for appeal; and that the act is an unwarranted interfer-
ence with plaintiffs' right to carry on lawful business,
make contracts or use and enjoy their property; that it
is unconstitutional because it imposes a legal duty be-
yond the police powers of the general assembly as a con-
dition precedent to the right to rent films, of obtaining
approval of defendants, and which approval may be
withheld in their discretion without hearing and with-
out right of appeal, if in their judgment the films are
sacrilegious, obscene, indecent, immoral or such as tend
to corrupt morals; and that plaintiffs are deprived of
the right to pursue a lawful business and the freedom
to contract, and of their property without due process
of law or the equal protection of the laws; that the ex-
treme penalties imposed evidences an intent to limit or
prevent judicial inquiry as to the validity of the act, and
that fear of fines will prevent exhibitors from renting

films; that the act attempts to give defendants legislative power, and delegates to them power to determine judicial questions without right of appeal to any court; and that it restrains the right of plaintiffs to freely write and publish their sentiments, guaranteed by the Constitution.

The bills further allege that defendants have demanded that plaintiffs submit to them for approval or rejection films or reels to be exhibited, and threatened to refuse to allow films to be rented to exhibitors unless plaintiffs comply with the demand, and have threatened to cause the arrest of all persons who seek to place on exhibition films not censored or passed upon, approved and stamped by them; that it will be impossible for defendants to inspect all films and reels which plaintiffs and others desire to rent to parties who exhibit in the State of Pennsylvania with sufficient rapidity to permit them to carry on business in the regular course, and that the delay which will be occasioned if the films must be submitted to defendants before they are produced will cause great and irreparable injury to plaintiffs' business; that the tax for censoring films imposes an illegal and oppressive burden upon the plaintiffs; that the operation of the act amounts to an unlawful regulation of interstate commerce and the deprivation of the property and liberty of plaintiffs without due process of law.

The bills pray that the Act of June 19, 1911, P. L. 1067, be declared unconstitutional; that the defendants be enjoined temporarily until hearing and perpetually thereafter from enforcing its provisions, or from inquiring into and investigating the films or reels sold or rented by plaintiffs, or from approving or disapproving such moving-picture films, and for general relief.

In the case of the "Overbrook Theatre," the individuals composing the firm aver that they are engaged in exhibiting moving pictures in the State of Pennsylvania, and, in addition to the general averments of unconstitutionality of the act of assembly set forth in the other

bills, alleged that it denies to these plaintiffs the right of trial by jury. Application was made for a preliminary injunction.

At the hearing, testimony was taken by plaintiffs in support of some of the allegations of the bills to show the character and number of films produced and the length of time necessary to examine them.

On behalf of defendants, a representative of the General Film Company testified that his company had submitted its films to the censorship; that the market value was not thereby depreciated; that it was not impossible to produce them in the time intended to release them, and that his company was not burdened by the payment of the fee required by the act.

Counsel for defendants expressed at the bar of the court a desire to file an answer to the bill of complaint in one of the cases and intention to file answers in all the cases. Counsel for plaintiffs suggested that the answers be considered as filed, and the application for an injunction be considered as a final hearing, and promised to file a replication, but neither answers nor replications have been filed, and the application now before the court is upon motion for a preliminary injunction.

Nothing but a clear violation of the Constitution—a clear usurpation of power prohibited—will justify the judicial department in pronouncing an act of the legislative department unconstitutional and void. The constitutionality of an act of assembly cannot be tried by the motives and designs of the law-makers, however plainly expressed. If the act itself is within the scope of their authority, it must stand: Powell v. Com., 114 Pa. 265.

It was said in Com. v. Keary, 198 Pa. 500: "It must not be lost sight of that the duty of courts is not one of hostility to acts whose constitutionality is attacked. On the contrary, all the presumptions are in their favor, as the courts are not to be astute in finding or sustaining objections."

"To justify a court in pronouncing an act of the legislature unconstitutional and void, whether in whole or in part, it must be able to vouch some exception or prohibition clearly expressed or necessarily implied. To doubt is to be resolved in favor of the constitutionality of the act......Prima facie, the legislative authority is absolute, except where expressly limited. This is the uniform principle of all political and legal views, and of all constructions recognized by constitutional law": Com. v. Moir, 199 Pa. 534, at pp. 554, 555. "The rule of law upon this subject appears to be that, except where the Constitution has imposed limits upon the legislative power, it must be considered as practically absolute, whether it operate according to natural justice or not in any particular case. The courts are not the guardians of the rights of the people of the State, except as those rights are secured by some constitutional provision which comes within the judicial cognizance. The protection against unwise or oppressive legislation, within constitutional bounds, is by an appeal to the justice and patriotism of the representatives of the people. If this fail the people in their sovereign capacity can correct the evil; but courts cannot assume their rights. The judiciary can only arrest the execution of a statute when it conflicts with the Constitution. It cannot run a race of opinions upon points of right, reason and expediency with the law-making power......If the courts are not at liberty to declare statutes void because of their apparent injustice or impolicy, neither can they do so because they appear to the minds of the judges to violate fundamental principles of republican government, unless it should be found that these principles are placed beyond legislative encroachment by the Constitution": Cooley on Constitutional Limitations, ch. 7, Sections 4 and 5; Russ v. Com., 210 Pa. 544, 555.

By reference to the act in question, it clearly appears that it is an exercise of the police power of the State, enacted to conserve the morals and manners of the pub-

lic, and as such its purport is within the scope of legislative authority.

Amongst the powers of the states not surrendered to the general government are the police powers exercised by passing laws to promote the peace, safety, good order, health and interests of the State. When a state exercises her sovereign power in a matter involving the interests of her citizens, though it may touch upon a subject within the power to regulate commerce, it is not invalid unless it conflicts with a law of Congress on the same subject: Craig & Blanchard ·v. Kline, 65 Pa. 399, 408, 409.

"It is more despotic and broader in its action than the right of eminent domain, caring for the public health and morals of the community, restraining individuals from interfering with them, and when it is found necessary to take private property under the police power, no compensation need be given the owner, unless expressly provided by statute. It is the application of the personal right or principle of self-preservation of the body politic": Bouvier's Law Dictionary, under the title Police Power, page 692.

In Philadelphia v. Scott, 81 Pa. 80, 85, Chief Justice AGNEW said: "The argument in this case took an extended range of discussion upon the powers of the State, of eminent domain and police. In their leading features, these powers are plainly different, the latter reaching even to destruction of property, as in tearing down a house to prevent the spread of a conflagration, or to removal at the expense of the owner, as in the case of a nuisance tending to breed disease.......Whether the prohibited act or omission shall be made a criminal offense, punishable under the general laws, or subject to punishment under municipal by-laws, or, on the other hand, the party be deprived of all remedy for any right which, but for the regulation, he might have had against other persons are questions which the legislature must decide": Cooley on Constitutional Limitations, 890.

Numerous cases of regulation and control of the use of private property in the exercise of the police power are cited in the opinion of the lower court in the case of Powell v. Com., 114 Pa. 265, and many others are enumerated by counsel in the argument in that case presented to the Supreme Court.

It was held in Com. v. Keary, 198 Pa. 500, that the Act of May 6, 1863, P. L. 582, making it unlawful for persons not possessed of a certificate of authority to act as agent for a railroad, steamboat or public conveyance, and sell tickets, does not contravene the bill of rights in the Constitution of Pennsylvania, the 14th Amendment to the Constitution of the United States or the interstate commerce clause.

In Com. v. Andrews, 211 Pa. 110, affirming an appeal from the Superior Court, it was held that Section 9 of the Act of May 29, 1901, P. L. 327, conferring jurisdiction upon the Court of Quarter Sessions to issue restraining orders forbidding the sale of oleomargarine without a license, was a constitutional exercise of the police power; that no question of the right of trial by jury arises, and if it did, that there is nothing in the Constitution which prohibits the legislature from declaring new offenses and defining the mode by which the guilt of persons accused may be determined. It was said by HENDERSON, J., in the Superior Court: "The statute was enacted under the police power of the Commonwealth for the preservation of the public health. ......This power, as was said in Bartemeyer v. Iowa, 85 U. S. 129, at page 138, 'extends to all regulations affecting the health, good order, morals, peace and safety of society, and under it all sorts of restrictions and burdens are imposed, and when they are not in conflict with any constitutional principles, they cannot be successfully assailed in a judicial tribunal.' "

The promotion of public morals and public health is a chief function of government, to be exercised at all times as occasion may require. The method by which the re-

sult may be accomplished depends upon the circumstances of the particular case, and the largest legislative discretion allowed: Beer Co. v. Massachusetts, 97 U. S. 25.

"The police power of the State," says Judge ORLADY in Com. v. Beatty, 15 Pa. Superior Ct. 5, 15, "is difficult of definition, but it has been held by the courts to be the right to prescribe regulations for the good order, peace, health, protection, comfort, convenience and morals of the community, which does not encroach on a like power vested in Congress or state legislatures by the Federal Constitution, or does not violate the provisions of the organic law; and it has been expressly held that the 14th Amendment to the Federal Constitution was not designed to interfere with the exercise of that power by the State: Powell v. Pennsylvania, 127 U. S. 678; Powell v. Com. 114 Pa. 265. Its essential quality as a governmental agency is that it imposes upon persons and property burdens designed to promote the safety and welfare of the public at large. The principle that no person shall be deprived of life, liberty or property without due process of law was embodied, in substance, in the constitutions of nearly all, if not all, of the states at the time of the adoption of the 14th Amendment, and it has never been regarded as incompatible with the principle, equally vital, because equally essential to the peace and safety of society, that all property in this country is held under the implied obligation that the owners' use of it shall not be injurious to the community."

"In the exercise of the police power of the State, it (the legislature) may enact laws in the interest of public morals, and to protect the lives, health and safety of persons following specified callings, and thus indirectly interfere with freedom of contract," i. e., with individual liberty and the right to acquire and use property: RICE, P. J., in Com. v. Brown, 8 Pa. Superior Ct., 339, 351-2.

"The police power is distinguished from the right of

eminent domain in that the State, by exercising the latter right, takes private property for public use, thereby entitling the owner to compensation under the Constitution, while the police power, founded as it is on the maxim 'sic utere tuo ut alienum non lædas,' is exerted to make that maxim effective by regulating the use and enjoyment of property by the owner, or, if he is deprived of his property altogether, it is not taken for public use, but rather destroyed in order to conserve the safety, morals, health or general welfare of the public, and in neither case is the owner entitled to compensation, for the law either regards his loss as damnum absque injuria or considers him sufficiently compensated by sharing in the general......benefits resulting from the exercise of the police power: 22 Am. & Eng. Ency. of Law (2d Ed.), 916"; Com. v. Plymouth Coal Co., 232 Pa. 141, 149.

The right to control the person as well as property was recognized by the Supreme Court of the United States in Jacobson v. Massachusetts, 197 U. S. 11, 26, where the defendant insisted that his liberty was invaded when the State subjected him to fine or imprisonment for refusing to submit to vaccination. The court said: "In Crowley v. Christensen, 137 U. S. 86, 89, we said: 'The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the government authority of the country essential to the safety, health, peace, good order and morals of the community. Even liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will. It is only freedom from restraint under conditions essential to the equal enjoyment of the same right by others. It is then liberty regulated by law. ......Whatever may be thought of the expediency of this statute, it cannot be affirmed to be beyond question in palpable conflict with the Constitution.'"

It was held in Pennsylvania R. R. Co. v. Ewing, 241 Pa. 581, that......uncompensated obedience to a regulation enacted for the public welfare or safety under the

police power of the State is not taking property without
due .compensation, and any injuries sustained in obey-
ing such regulation is but damnum absque injuria, and
such requirement is not in violation of the constitutional
inhibition against the impairment of the obligation of
contracts; and that the Act of June 19, 1911, P. L. 1053,
being a valid exercise of police power by the legislature,
the fact that railroad companies affected by it must
make additional expenditures to comply with its pro-
visions is an immaterial matter, so far as the courts are
concerned.

In Gundling v. City of Chicago, 176 Ill. 340, the fact
that young persons of weak and immature minds are
more liable to use tobacco in the form of cigarettes than
in any other form was considered sufficient to authorize
the city to single out, regulate and license the sale of
tobacco in that form without including any other form
of tobacco.

In the exercise of police powers by legislative bodies,
the delegation of administrative duties may be made
to subordinate bodies.

In Locke's App., 72 Pa. 491, 498, it was said by AG-
NEW, J.: "What is more common than to appoint com-
missioners under a law to determine things upon the
decision of which the act is to operate in one way or an-
other?......Take the case of granting a license to keep
an inn and sell liquor. The judge determines whether the
license is necessary, and if not necessary, the law says to
the applicant, 'no license.' The law takes effect as the
judge determines, yet who says it is the court that legis-
lates?......The true distinction, I conceive, is this:
The legislature cannot delegate its power to make a law,
but it can make a law to delegate a power to determine
some fact or state of things upon which the law makes,
or intends to make, its own action depend. To deny this
would be to stop the wheels of government. There are
many things, upon which wise and useful legislation
must depend, which cannot be known to the law-making

power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation......
If a determining power cannot be conferred by law, there can be no law that is not absolute, unconditional and peremptory; and nothing which is unknown, uncertain and contingent can be the subject of law :......Half the statutes on our books are in the alternative, depending on the discretion of some person or persons, to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said the exercise of such a discretion is the making of the law."

The Act of Jan. 29, 1818, P. L. 38, is an illustration of the exercise of legislative power in appointing and vesting authority in administrative officers. The Board of Health was constituted and authorized to make general rules in the discharge of their duties. The act required the payment of $2.50 by vessels during quarantine months specified in the act, and compelled them to stop at the lazaretto to be examined by the physician and quarantine master, and provided that before any part of the cargo or baggage was landed, or any person permitted to leave or board the ship, the examination required by the act should be perfected under a penalty of $500, and if it appeared, upon examination, that the vessel came from a port at which a malignant or contagious disease prevailed, the act provided that it should be detained at the lazaretto for such time as the Board of Health deemed necessary, not exceeding twenty days, and the board was authorized to determine what measure should be pursued to cleanse the vessel and restore the health of diseased persons on board, which direction should be carried into execution at the expense of the master, owners or consignees of the vessel and goods. At the expiration of said time, if it should appear to the physician and quarantine master that certain diseases had not occurred on the vessel, and the physician and quarantine master certified the facts to the Board of

Health, and expressed the opinion that the vessel might be safely suffered to proceed to the city, the captain could proceed, unless the Board of Health deemed it necessary to cause a further detention of the vessel, or the cargo, or of the crew or passengers, or of any baggage on board, in which case it was to be detained until the Board of Health gave authority to proceed and enter the city.

It was also made the duty of the board to cause nuisances which, in their opinion, endangered the health of the citizens to be removed from the streets or any other parts of the city at the expense of the owner of the premises on which any nuisance was found.

The laws relating to building inspection make it unlawful to erect, alter, repair or remove any building unless a permit is obtained from the Bureau of Building Inspection, or to erect any building except in conformity with plans and specifications approved by the bureau.

The appeal provided by the act lies to the board, and from the board to the director of public safety, who appoints an examining commission of three experts, any two of which may make a decision.

The ordinance of March 28, 1894, makes it unlawful to repair, reconstruct or remove any frame building which has been injured more than 50 per cent. of its original value by wear and tear, or by the effects of the elements, or by fire, and the value is to be determined by the Bureau of Building Inspection.

In Kennedy v. The Board of Health, 2 Pa. 366, it was held that the board has final jurisdiction in determining the fact of the existence of a nuisance which they order to be removed.

In United States v. Grimaud, 220 U. S. 506, it was held that Congress acted within its constitutional power in conferring authority on the secretary of agriculture to make rules under the acts establishing forest reserves, to regulate their use for grazing sheep and other legal purposes; and that the power conferred was adminis-

trative and not legislative.   The defendants were indicted for grazing sheep on a reservation without obtaining permission of the secretary of agriculture.   It was argued that the Act of Congress was unconstitutional, in so far as it delegated to the secretary power to make rules and regulations, and made the violation a penal offense.   It was said by Mr. Justice LAMAR (page 516) : "In the nature of things, it was impracticable for Congress to provide general regulations for these various and varying details of management.   Each reservation had its peculiar and special features; and in authorizing the secretary of agriculture to meet these local conditions, Congress was merely conferring administrative functions upon an agent and not delegating to him legislative power.......From the beginning of the government, various acts have been passed conferring upon executive officers power to make rules and regulations, not for the government of their departments, but for administering the laws which did govern.   None of these statutes could confer legislative power.   But when Congress had legislated and indicated its will, it could give to those who were to act under such general provisions 'power to fill up the details' by the establishment of administrative rules and regulations, the violation of which could be punished by fine or imprisonment fixed by Congress."

In Brodbine v. Revere, 182 Mass. 598, a park board was given authority to make rules and regulations for the control and government of roadways under its care. It was held that a provision in the act making infractions of the rules breaches of the peace, punishable in any court having jurisdiction, was not a delegation of legislative power.   The court referred to the fact that the punishment was not fixed by the board, saying that the making of the rules was administrative, while the substantive legislation was in the statute, which provided that they should be punished as breaches of the peace. .......But the authority to make administrative rules

is not a delegation of legislative power, nor are such rules raised from an administrative to a legislative character because the violation thereof is punished as a public offense.

In Monongahela Bridge Co. v. United States, 216 U. S. 177, it was held that Congress may, in order to enforce its enactments, clothe an executive officer with power to ascertain whether certain specified facts exist, and thereupon to act in a prescribed manner, without delegating, in a constitutional sense, legislative or judicial power to such officer. It was said, referring to the power of the secretary of war to require the removal of obstructions to navigation (page 195) : "It is for Congress, under the Constitution, to regulate the right of navigation by all appropriate means, to declare what is necessary to be done in order to free navigation from obstruction, and to prescribe the way in which the question of obstruction shall be determined. Its action in the premises cannot be revised or ignored by the courts or by juries, except that when it provides for an investigation of the facts, upon notice and after hearing, before final action is taken, the courts can see to it that executive officers conform their action to the mode prescribed by Congress. Learned counsel for the defendant suggests some extreme cases, showing how reckless and arbitrary might be the action of executive officers proceeding under an Act of Congress, the enforcement of which affects the enjoyment or value of private property. It will be time enough to deal with such cases as and when they arise. Suffice it to say that the courts have rarely, if ever, felt themselves so restrained by technical rules that they could not find some remedy consistent with the law for acts, whether done by government or by individual persons, that violated natural justice or were hostile to the fundamental principles devised for the protection of the essential rights of property."

In Lieberman v. Van De Carr, 199 U. S. 552, an act

providing that no milk should be received or held or delivered without a written permit from the Board of Health was held constitutional, and that a state has the right, in the exercise of the police power, and with a view to protect the public health and welfare, to make reasonable regulations in regard to such occupations as may, if unrestrained, become unsafe or dangerous, and the conferring of discretionary power upon administrative boards to grant or withhold permission to carry on such a trade or business is not violative of the 14th Amendment, as depriving those engaged in that business of their property without due process of law or denying them the equal protection of the laws; and that there is no presumption that a power granted to an administrative board will be arbitrarily or improperly exercised. It was said by Mr. Justice DAY (page 559) : "It is unnecessary now to determine whether the action of the board in refusing or revoking such a permit would be judicial and thus reviewable by mandamus or certiorari, or whether, if the authority should be arbitrarily or improperly exercised, the only remedy would be an application for the removal of the officers; for those are questions that may arise in the administration of the law, but do not go to its validity......It is presumed that public officials will discharge their duties honestly and in accordance with the rules of law. (After citing cases, page 562) : These cases leave in no doubt the proposition that the conferring of discretionary power upon administrative boards to grant or withhold permission to carry on a trade or business which is the proper subject of regulation within the police power of the State is not violative of rights secured by the 14th Amendment."

In Com. v. Kevin, 202 Pa. 23, the Act of June 26, 1895, P. L. 317, known as the "Pure Food Law," was held constitutional and a proper exercise of the police power of the State. Mr. Justice MESTREZAT (page 29) quoting from Powell v. Com., 114 Pa. 265, said: "The manufacture, sale and keeping with intent to sell may all alike be

prohibited by the legislature, if in their judgment the protection of the public from injury or fraud requires it. To deny the authority of the legislature to do so is to attack all that is vital in the police power. To refuse recognition of the power in a given case, because, in the judgment of some, the legislature, though acting within its proper sphere, may have mistaken the public necessity for a law prohibitory in its character, is to make the individual judgment superior to that of the legislature, to which the people in their sovereign capacity have delegated the lawmaking power."

The case of Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, on appeal to the United States Supreme Court, was affirmed, and it was held that the business of mining coal was attended with dangers which render it a proper subject of police regulation by the State, and that it is not an unreasonable exercise of the power to require owners of adjoining properties to cause boundary pillars to be left in the ground of sufficient width to safeguard the employees of either mine, in case the other should be abandoned and allowed to fill with water, although the regulation prevents the removal and marketing of the coal contained in the pillars; and in determining whether the constitutional rights of a party have been affected by a State statute, the courts will presume, until the contrary is shown, that any administrative body to which power is delegated will act with reasonable regard to property rights; that in matters of police regulation, where decisions on questions of public safety are delegated to an administrative board, the right of appeal on other than constitutional grounds may be withheld by the legislature, in its discretion, without denying due process of law; and that the statute is not unconstitutional, either as depriving the owners of their property without due process of law or as denying them equal protection of the law, or because of the procedure and method prescribed for determining the width of the

barrier delegating the matter to an administrative board without providing for any appeal.

Mr. Justice PITNEY, in the opinion (page 542), cites the case of Curran v. Delano, 235 Pa. 478, 485, and adds: "The legislature has not defined with precision the width of the pillar, and it is very properly admitted that in the nature of things this would have been impossible, because the width necessary in each case must be determined with reference to the situation of the particular property. From this it necessarily results that it was competent for the legislature to lay down a general rule, and then establish an administrative tribunal with authority to fix the precise width or thickness of pillar that will suit the necessity of the particular situation, and constitute a compliance with the general rule: United States v. Grimaud, 220 U. S. 506, 517-522. Administrative bodies with authority not essentially different are a recognized governmental institution. Commissions for the regulation of public service corporations are a familiar instance: Interstate Commerce Commission v. Cincinnati, New Orleans & Texas Pacific Ry. Co., 167 U. S. 479, 495. And it has become entirely settled that powers and discretion of this character may be delegated to administrative bodies or even to a single individual......It is further objected that the statute provides no appeal from the determination of the tribunal. But in such cases the right of appeal on other than constitutional grounds may be conferred or withheld, at the discretion of the legislature......Were this not expressed in the act, it would none the less be implied, at least so far as pertains to any violation of rights guaranteed by the 14th Amendment." Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 547.

In Curran v. Delano, 235 Pa. 478, it was held that the jurisdiction of a tribunal created by the legislature to establish the width of boundary pillars between mines is exclusive.

Van Swartow v. Com., 24 Pa. 131, was a case involving

the Act of April 14, 1851, P. L. 548, prohibiting the sale of liquor on Sunday in Allegheny County, except for medicinal purposes, under a penalty of $50, and authorizing a conviction before an alderman, and it was decided not unconstitutional by reason of failing to provide a trial by jury. BLACK, C. J., said: "There is nothing to forbid the legislature from creating a new offense and prescribing what mode they please of ascertaining the guilt of those who are charged with it. Many tribunals unknown to the framers of the Constitution, and not at all resembling a jury, have been erected and charged with the determination of grave and weighty matters; for instance, commissioners, viewers and appraisers of damages, county and township auditors, and those officers of the State government whose duty it is to settle the public accounts. All of these functionaries have at different times in our history been empowered to decide the most important controversies without appeal. ......The purpose of the Constitution undoubtedly was to preserve the jury trial, whenever the common law gave it, and in all other cases to let the legislature and the people do as their wisdom and experience might direct." In Rhines v. Clark, 51 Pa. 96, 101, it was said by WOODWARD, C. J.: "Doubtless the legislature may withhold trial by jury from new offenses created by statute and unknown to the common law, as in the instances of the Sunday law (Van Swartow v. Com., 24 Pa. 131), and of numerous enactments in the nature of police regulations for preservation of the public peace."

"The legislature may provide any system of settlement or trial without coming in conflict with the provision of the Constitution, if trial by jury did not exist in such case theretofore": School District Duquesne Boro. v. Pitts., 184 Pa. 156, 160; Com. v. McCann & Co., 174 Pa. 19, 21.

The court cannot pronounce a tax unconstitutional on the mere ground of injustice and inequality: Weber v. Reinhard & Eisenhard, 73 Pa. 370.

In Bradley v. City of Richmond, 227 U. S. 477, it was held that a privilege tax may perform the double function of regulating the business under the police power and of producing revenue, if authorized by the law of the State. It was said by Mr. Justice LURTON (page 483) : "If the right to appear and to be heard and to obtain a review should prove illusory, there would, under general principles of jurisprudence, remain the right to judicial review, if the result should violate either a right secured under the law of the State or that of the United States."

In Red "C" Oil Mfg. Co. v. Board of Agriculture of North Carolina, 222 U. S. 380, a question arose under a North Carolina act for inspection, under control of the Board of Agriculture, of illuminating oil. It was held that the court would not attribute improper motives to the law-making power, and on a mere charge regard a statute imposing inspection fees as an act to raise revenue; that, prima facie, the charge for inspection in an act otherwise constitutional is reasonable; and that if the inspection fees exact under a State statute average largely more than enough to pay expenses, the presumption is that the State will reduce them to conform to the constitutional authority to impose fees solely to reimburse for expense of inspection; that a requirement by the legislature that illuminating oils must be safe, pure and afford a satisfactory light establishes a sufficient primary standard, and remitting to the proper State board the establishment of rules and regulations to determine what oils measure up to those standards does not amount to a delegation of legislative power. Where one complains that regulations promulgated under legislative authority by a State board are unreasonable and oppressive, he should seek relief by applying to that board to modify them.

The penalties are fixed by Section 9 of the Pennsylvania Act creating the Board of Censors; there is no

power in the magistrate to increase them, and he is specifically prohibited from reducing them.

The act is entitled "An Act regulating the exhibiting or using of moving pictures and stereopticon views; providing for and regulating the examination and approval of moving picture films, or reels, and stereopticon views; and fixing penalties for the violation of this act."

The subject-matter is clearly expressed in the title, which is general in its terms and does not attempt to furnish an index of its contents, but is sufficient to lead to inquiry beyond the title into the body of the bill to ascertain the extent of the regulations enacted: Com. v. McKenty, 52 Pa. Superior Ct. 332.

In Booth & Finn v. Miller, 237 Pa. 297, 304, it was said by Mr. Justice MESTREZAT: "We have repeatedly said that the title need not embody all the distinct provisions of the bill, nor serve as an index or digest of its contents, but that it is sufficient if the title fairly gives notice of the real subject of the bill, so as reasonably to lead to an inquiry into what is contained in the body of the bill."

Most of the questions involved in this issue were considered in Mutual Film Co. v. The Industrial Commission of Ohio, decided by the District Court of the United States for the Northern District of Ohio, April 2, 1914, 215 Fed. Repr. 138, upon an application for an injunction to restrain the Board of Censors appointed under an act of assembly in essential terms similar to the statute now under consideration. The injunction was refused, and the Ohio act was held constitutional. A reference to the carefully considered opinion of the court in that case makes it unnecessary to review in detail all the objections urged in the present cases.

In Block v. City of Chicago, 239 Ill. 251, an ordinance required persons engaging in the business of exhibiting moving pictures to secure a permit from the chief of police, who was forbidden to issue permits for obscene or immoral pictures. An application was made to enjoin

the enforcement of the ordinance on the ground that it was unconstitutional, in that it discriminated against exhibitors, delegated legislative authority to the chief of police, fixed no standard by which he was to determine the character of the pictures, took the property of complainant without due process of law, and was unreasonable and oppressive. The court referred to the fact that the exhibitions, on account of the low price of admission, are frequented and patronized by a large number of children, and that the audiences included those classes whose age, education and situation in life especially entitle them to protection against the evil influence of obscene and immoral representations, and said: "The purpose of the ordinance is to secure decency and morality in the moving-picture business, and that purpose falls within the police power......The welfare of society demands that every effort of municipal authorities to afford such protection shall be sustained, unless it is clear that some constitutional right is interfered with......" Page 264: "There is a great diversity of opinion as to what constitutes good moral character, but it is beyond question that an officer authorized to grant a license to keep a dram-shop may determine whether the applicant has a good moral character, and there has been no ground for complaint that the power has been wrongfully or oppressively exercised against applicants." Page 263: "Manifestly it would be impossible to specify in an ordinance every picture or particular variety which would be considered immoral or obscene, and no definition could be formulated which would afford a better standard than the words of the ordinance......The average person of healthy and wholesome mind knows well enough what the words 'immoral' and 'obscene' mean, and can intelligently apply the test to any picture presented to him......It is presumed that the chief of police or the mayor, in case of an appeal to him, will perform his duty with reasonable intelligence and in accordance with the generally accepted meaning of the

words.  If there should be an abuse of power on the part
of either the chief of police or the mayor, the ordinance
does not prevent an application to a court to compel
either officer to perform his duty and issue a permit for
a picture which is not immoral or obscene." Page 265:
"It was argued that some sort of a hearing is required
in court to determine the fact whether a picture proposed
to be exhibited, or one that has been exhibited, is im-
moral or obscene.  We know of no decision sustaining
such a doctrine, and counsel do not appear to have found
any.  As we have already seen, there is no lawful objec-
tion to the determination of the question by the chief of
police."  The decree sustaining demurrer to the bill was
affirmed.

In Laurelle v. Bush, 17 Cal. App. 409, an ordinance
requiring moving-picture shows to be licensed by the
Board of Police Commissioners, and limiting the places
where such license should be granted, was held valid.

In Higgins v. Lacroix, 119 Minn. 145, an act imposing
a license fee on moving-picture shows was held to be con-
stitutional, and in Dreyfuss v. Montgomery, 58 So. Repr.
730, where an ordinance restricted the location of mov-
ing-picture shows to a prescribed district, it was decided
to be valid.  In the former case it was said: "Moving-
picture shows are of comparatively recent origin, but of
rapid growth, springing up everywhere in the large cities
and invading even villages and towns of modest size.
While, as generally conducted, some educational value
may be conceded to exist in these shows, it is neverthe-
less true that the chief aim is to furnish the sort of enter-
tainment that will draw the most dimes.  To furnish peo-
ple with innocent and cheap amusement is laudable, but
experience teaches that, where amusements are fur-
nished for pecuniary profits, the tendency is to furnish
that which will attract the greatest number rather than
that which instructs or elevates.  To say the least, opin-
ions are quite at variance as to the merits of moving-
picture shows as an influence for good or evil in a com-

munity. It must, therefore, be classed among those pursuits which are liable to degenerate and menace the good order and morals of the people, and may, therefore, not only be licensed and regulated, but also prevented by a village council."

It is alleged in each of the bills of complaint that none of the moving pictures, films or reels owned by the plaintiffs, and rented or intended to be rented in the Commonwealth, or exhibited, are sacrilegious, obscene, indecent, immoral or such as tend to corrupt morals, but, on the contrary, are moral and proper. If such be the case, it may be presumed that they will be passed by the censors, and while complaint is made of anticipated inconvenience and expense, plaintiffs have made no attempt to comply with the terms of the act, and it is not possible to determine in advance that it is impractical to carry out its provisions.

Official censorship has already been established in four states and many cities, and a bill is pending in Congress to create a federal motion-picture commission for licensing films. There is a voluntary board known as the National Board of Censorship of Motion Pictures in New York, which has issued publications giving its policies and standards of judgment, and it is working in harmony with manufacturers, importers and exhibitors. That board views from 150 to 185 film subjects a week, and the pictures are daily seen by about 8,000,000 of people in 18,000 motion-picture houses in the United States. During last year 53 subjects were condemned and parts eliminated in 401. The cost of these negatives, copies included, was over $582,000. Realizing that pictures stimulating the senses require particular study from the point of view of the adolescent, the board has adopted standards curtailing prolonged love scenes which are ardent beyond the strict requirements of the dramatic situation, and restricts the display of clothing and the person in ways to arouse the imagination and suggest immorality and indecency. It has discounte-

nanced the portrayal of crime where it degenerates into pandering to a morbid appetite, and excludes gruesome and suggestive details. Careful elimination has also taken place in various forms of sex lapses, where pictures have been calculated to arouse rather than minimize passion, or tend to perpetuate the double standard of morality, but it has given support to subjects and films which present facts in a sincere and dramatic way. (The Survey, June 27, 1914.)

"We may once more repeat what has been so often said, that one who would strike down a State statute as violative of the Federal Constitution must show that he is within the class with respect to whom the act is unconstitutional, and must show that the alleged unconstitutional feature injures him, and so operates as to deprive him of rights protected by the Federal Constitution": PITNEY, J., in Plymouth Coal Co. v. Pennsylvania, 232 U. S. 531, 544-5.

In Western Turf Association v. Greenberg, 204 U. S. 359, 363, it was held that a corporation is not deemed a citizen within the clause of the Constitution of the United States protecting the privileges and immunities of citizens of the United States from being abridged or impaired by the law of a state; and the liberty guaranteed by the 14th Amendment against deprivation without due process of law is that of natural, not artificial persons.

As to the additional claim made by the individual plaintiffs that they have been deprived of the right of trial by jury, no question of the right of trial by jury arises in the case. There is nothing in the Constitution which prohibits the legislature from declaring new offenses and defining the mode by which the guilt of persons accused thereof may be determined: Van Swartow v. Com., 24 Pa. 131.

Neither the eloquent argument nor the able and exhaustive brief presented by the counsel for plaintiffs has

250 BUFFALO B., M. F. C., Appellant, v. BREITINGER.

convinced the court that the Act of June 19, 1911, P. L. 1067, is unconstitutional.

The court refused the injunction and on final hearing dismissed the bill. Plaintiffs appealed.

*Errors assigned* were in dismissing various exceptions to the findings of the chancellor and the decree of the court.

*George Quintard Horwitz,* with him *Frank Smith,* for appellants.

*Morris Wolf,* with him *Francis Shunk Brown,* Attorney General, for appellees.

PER CURIAM, July 3, 1915:

These are three separate bills in equity brought by the Buffalo Branch, Mutual Film Corporation; Mutual Film Corporation of Pennsylvania and Interstate Films Company; and the Overbrook Theatre, respectively, against J. Louis Breitinger, chief censor, and E. C. Niver, assistant censor, constituting the State Board of Censors. The bills aver that for the reasons therein set forth the Act of June 19, 1911, P. L. 1067, regulating the exhibiting or using of moving-pictures and stereopticon views, offends both the federal and State Constitutions, and pray that the act be declared unconstitutional and void, that the defendants who constitute the State Board of Censors, appointed under the act, be enjoined from enforcing its provisions, and from inquiring into and investigating, approving or disapproving films, reels and views which are to be sold or rented by the plaintiffs. The full bench of the Court of Common Pleas No. 5 of Philadelphia County heard the motions for preliminary injunctions and refused them. Subsequently, the court in banc entered decrees refusing permanent injunctions and dismissing the bills. The cases were all disposed of in one opinion by the learned presi-

dent judge whose elaborate discussion of the questions raised below and here leaves nothing that can profitably be added to sustain the decrees. It may be suggested that since the decrees were entered the Supreme Court of the United States in Mutual Film Corporation v. Industrial Commission of Ohio, 236 U. S. 230, and Mutual Film Company of Missouri v. Hodges, Governor of the State of Kansas, 236 U. S. 248, has considered and decided most of the questions raised by appellants here, and its conclusion is in accord with that of the learned Common Pleas in these cases.

The majority of the court are of opinion that the decrees should be affirmed on the opinion of the court below, and it is so ordered.