## Pennsylvania State Athletic Commission v. Loughran

*Thomas J. Burke, Haws & Burke,* for appellant.

*Joseph C. Mansfield, Elmer T. Bolla,* Deputy Attorneys General, *Herbert B. Cohen,* Attorney General, for Pennsylvania State Athletic Commission.

SOHN, J., February 14, 1956.—We have before us an appeal·from an order of the Pennsylvania State Athletic Commission, dated July 6, 1955, suspending the manager's license of appellant, Thomas Loughran, for a period of six months, for specified violation of the Boxing Code and the athletic commission regulations.

The original citation was issued by the Pennsylvania State Athletic Commission on May 13, 1955, charging appellant with failing and neglecting to make known

to the commission, or its authorized representatives, the fact that boxer Harold Johnson was unfit to proceed with the boxing match against Julio Maderos at Philadelphia on May 6, 1955, and in violation of section 15 of the Act of June 14, 1923, P. L. 710, as amended, with conduct "detrimental to the interests of boxing." Appellant was cited to appear at a hearing fixed for May 16, 1955, at the Pennsylvania State Athletic Commission's office at Philadelphia, to show cause why appellant's manager's license should not be suspended or revoked under section 15 of the Act of June 14, 1923, P. L. 710, as amended, and in accordance with the Administrative Agency Law of June 4, 1945, P. L. 1388, as amended.

On May 16, 1955, by stipulation of counsel for appellant, the original citation was orally amended to add the charge that appellant violated section 14 of the act relating to "sham or collusive exhibitions."

On May 23, 1955, the amended citation against appellant was reduced to writing and delivered to appellant's counsel.

The citation against appellant was occasioned by the physical collapse of boxer Harold Johnson at the conclusion of the second round of his scheduled boxing match with Julio Maderos on May 6, 1955, at the Philadelphia arena, which was promoted by Herman Taylor, trading as Herman Taylor Sports Enterprises, of Philadelphia. Appellant, Loughran, was the manager of record of Harold Johnson.

Hearings were held, commencing May 16 and terminating on June 17, 1955. In all, there were nine days of hearings, involving not only Loughran but various other persons. Appellant was represented by counsel, appeared at the hearings and testified in his own behalf. On July 6, 1955, the commission entered its adjudication and order in these proceedings. The commission found that appellant was fully aware that

Johnson was in no fit physical condition to engage in the boxing contest with Maderos, but nevertheless willfully failed to disclose Johnson's condition to representatives of the athletic commission. The commission concluded that in willfully failing to bring his knowledge of Johnson's unfit condition to the attention of the commission, appellant participated in a sham or collusive boxing match, in violation of section 14 of the act, and was guilty of an act detrimental to the interests of boxing and a violation of section 15 of the act. The commission accordingly ordered that appellant's manager's license be suspended for a period of six months. This appeal then followed.

Among the various contentions raised by appellant in this case is one that sections 14 and 15 of the Act of June 14, 1923, P. L. 710, as amended, 4 PS §§11, 12, are so vague, indefinite and uncertain as to be incapable of enforcement, and, therefore, that they are unconstitutional.

They provide as follows:

"Section 14. Sham or Collusive Exhibitions.— Every corporation, and the officers thereof, and any person, physician, referee, judge, timekeeper, announcer, matchmaker, professional boxer, manager, or second, who shall conduct, give or participate in any sham or collusive boxing, sparring, or wrestling match or exhibition, shall be deprived of his license by the commission."

"Section 15. Revocation or Suspension of Licenses. —Any license herein provided for may be revoked or suspended, after hearing, by the commission for the reason therein stated, that the licensee has, in the judgment of said commission, been guilty of an act detrimental to the interests of boxing or wrestling. However, the commission, in its discretion, may fix a fine or fines which if paid can be accepted in lieu of any revocation or suspension of permit."

We are well aware that our Supreme Court in Panther Valley Television Company v. Summit Hill Borough, 376 Pa. 375 (1954) has said:

" ' "Where a statute is 'so vague, indefinite and uncertain that the courts are unable to determine, with any reasonable degree of certainty, what the legislature intended, or is so incomplete or conflicting and inconsistent in its provisions that it cannot be executed, it will be declared inoperative.' " ' "

In Murray v. Philadelphia, 364 Pa. 157, 176 (1950), and in Willcox v. Penn Mutual Life Insurance Co., 357 Pa. 581, 595 (1947), the same doctrine is followed.

Appellant argues that the words "sham or collusive boxing match" and acts "detrimental to the interests of boxing" are too vague, indefinite and uncertain to be properly enforced, and vest too much discretionary power in the State athletic commission.

We do not think that either of these two phrases is vague, indefinite or uncertain, or that the legislature is bound to define them, or to set up standards by which the commission must be governed in forming its judgment. We believe that any person of ordinary intelligence would have no difficulty in determining if a boxing match was a "sham" and that one instinctively knows what acts "detrimental to the interests of boxing" are, just as he consciously knows right from wrong. One need only read the entire act and its context to understand what the legislature had in mind when the questioned language was put in the statute. As our Supreme Court pointed out in Buffalo Branch, Mutual Film Corporation v. Breitinger, 250 Pa. 225 (1915), in sustaining the Act of June 19, 1911, P. L. 1067, providing for the appointment of a State Board of Censors to regulate the operation and exhibition of motion pictures:

"Nothing but a clear violation of the Constitution— a clear usurpation of power prohibited—will justify

the judicial department in pronouncing an act of the legislative department unconstitutional and void."

In Locke's Appeal, 72 Pa. 491, 498 (1872), Judge Agnew said:

"What is more common than to appoint commissioners under a law to determine things upon the decision of which the act is to operate in one way or another? . . . Take the case of granting a license to keep an inn and sell liquor. The judge determines whether the license is necessary, and if not necessary, the law says to the applicant, 'no license.' The law takes effect just as the judge determines, yet who says it is the court that legislates? . . .

"Then, the true distinction, I conceive, is this: The legislature cannot delegate its power to make a law; but it can make a law to delegate a power to determine some fact or state of things upon which the law makes, or intends to make, its own action depend. To deny this would be to stop the wheels of government. There are many things upon which wise and useful legislation must depend, which cannot be known to the law-making power, and must, therefore, be a subject of inquiry and determination outside of the halls of legislation. . . . If a determining power cannot be conferred by law, there can be no law that is not absolute, unconditional and peremptory; and nothing which is unknown, uncertain and contingent can be the subject of law. . . .

"Half the statutes on our books are in the alternative, depending on the discretion of some person or persons, to whom is confided the duty of determining whether the proper occasion exists for executing them. But it cannot be said the exercise of such a discretion is the making of the law."

In Bell Telephone Company of Pennsylvania v. Driscoll, 343 Pa. 109, our Supreme Court points out, at page 116:

"There are undoubtedly situations where the courts have been able to gather a definite and clear standard or criterion for the guidance of commissions and similar bodies by resort to an entire act and the context. Such were the situations in *Texas v. U. S.*, 292 U. S. 522, 54 S. Ct. 819; *New York Central Securities Co. v. U. S.*, 287 U. S. 12, 53 S. Ct. 45; *Federal Radio Com. v. Nelson Bros. Co.*, 289 U. S. 266, 53 S. Ct. 627."

We believe that the language of the Illinois court in Block v. City of Chicago, 239 Ill. 251, which was quoted with approval by our Supreme Court in *Buffalo Branch, Mutual Film Corporation, v. Breitinger*, supra, is particularly appropriate when we consider the question raised by appellant in this case. There our Supreme Court stated, at page 245:

"In Block v. City of Chicago, 239 Ill. 251, an ordinance required persons engaging in the business of exhibiting moving pictures to secure a permit from the chief of police, who was forbidden to issue permits for obscene or immoral pictures. An application was made to enjoin the enforcement of the ordinance on the ground that it was unconstitutional, in that it discriminated against exhibitors, delegated legislative authority to the chief of police, fixed no standard by which he was to determine the character of the pictures, took the property of complainant without due process of law, and was unreasonable and oppressive. The court referred to the fact that the exhibitions, on account of the low price of admission, are frequented and patronized by a large number of children, and that the audiences included those classes whose age, education and situation in life especially entitle them to protection against the evil influence of obscene and immoral representations, and said: 'The purpose of the ordinance is to secure decency and morality in the moving-picture business, and that purpose falls within the police power. . . . The welfare of society demands

that every effort of municipal authorities to afford such protection shall be sustained, unless it is clear that some constitutional right is interfered with . . .' Page 264: 'There is a great diversity of opinion as to what constitutes good moral character, but it is beyond question that an officer authorized to grant a license to keep a dram-shop may determine whether the applicant has a good moral character, and there has been no ground for complaint that the power has been wrongfully or oppressively exercised against applicants.' Page 263: '*Manifestly it would be impossible to specify in an ordinance every picture or particular variety which would be considered immoral or obscene, and no definition could be formulated which would afford a better standard than the words of the ordinance. . . . The average person of healthy and wholesome mind knows well enough what the words "immoral" and "obscene" mean, and can intelligently apply the test to any picture presented to him. . . .* It is presumed that the chief of police or the mayor, in case of an appeal to him, will perform his duty with reasonable intelligence and in accordance with the generally accepted meaning of the words.' " (Italics supplied.)

We believe that the opinion of Judge William E. Hirt in Commonwealth v. Klick, 164 Pa. Superior Ct. 449 (1949) is particularly demonstrative with respect to the issue we are passing upon here. This case involved the constitutionality of section 1002(a) of The Vehicle Code of May 1, 1929, P. L. 905, as amended. At page 453, Judge Hirt points out:

"In 12 Am. Jur., Constitutional Law, §585, the universally accepted rule is thus stated: 'It is a general principle of statutory law that a statute must be definite to be valid. A statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at

its meaning and differ as to its application violates the first essential of due process of law. On the other hand, where the words assailed, taken in connection with the context, are commonly understood, their use does not render a statute invalid.' The mandate of §1002(a) is a salutary police measure limiting the operation of motor vehicles, in the public interest. To define specifically permissible rates of speed under every conceivable condition would be manifestly impossible; hence the general language of §1002(a) is no valid objection to it on constitutional grounds. The ordinary person can understand what standard of conduct is imposed, as well as what he may do and what is forbidden under this provision of the Act.

"The same criticism which defendant urges here might be directed to §1001 (75 PS §481) of the Act making reckless driving unlawful. What is reckless driving or what is failure to drive at a careful and prudent speed depends upon the particular circumstances. As in the case of reckless driving, the determination of what constitutes driving 'too fast for conditions' is for the finder of the facts, in this case a judge of the court below, in a summary proceding."

Here we feel that the State athletic commission had a right to determine the facts and to decide whether the actions of Loughran were "detrimental to the interests of boxing."

We believe that the phrases "sham or collusive boxing match" and acts "detrimental to the interests of boxing" need no definition by our legislature. Where is there an individual, interested in boxing, who has not, at some time or other, attended a boxing bout or a wrestling bout, in which the actions of the contestants became so apparently indifferent or collusive, in which it appeared so clearly that they were not putting forth their very best efforts to win the contest, that the audience indulged in catcalls, verbal comments,

stamping of feet, whistling and in various other manifestations of disapproval of the way the contest was being conducted? Any 10-year-old boy can quickly recognize such a spectacle. The public pays good money to see honestly conducted fights and expects each contestant to be in condition and to do his best. A veritable wave of protest has been sweeping over the whole United States against the way in which boxing generally has been conducted, and any person of ordinary intelligence knows that on many occasions the public has been hoodwinked and cheated out of their money. By this language we do not mean to judge this particular case, but we feel very strongly that the legislature knew exactly what it was saying when it put that language into the act and that no further definition is necessary. Everyone consciously knows right from wrong and needs no diagram or blackboard demonstration to guide his actions. Even if there were no law against abortion, the physician knows that his act in committing one would constitute a violation of the moral law. So, too, every lawyer knows that within the limits of his ability, he must put forth his best efforts on behalf of his client, that he must deal fairly and honestly with him, and knows instinctively every act which is in violation of ethical conduct. With these principles in mind, let us turn now to the evidence presented against appellant.

The testimony of two witnesses alone, that is, the testimony of Harold Johnson and appellant, Thomas Loughran, convinces us that the decision of the commission was not in error. The testimony of Johnson shows very clearly just in what bad shape he was for at least an hour prior to the time he entered the ring on the night of the fight. His condition was such that it must have been apparent to his manager, as well as to anybody who looked at him or talked to him. Appellant came back to the arena on the night of the

fight sometime shortly after nine o'clock. When Johnson came to the arena that evening, he ate an orange which had been given to him earlier in the day, and which he had been carrying around in his pocket. He said that the orange tasted very bitter, and then at other times, sweet. While the preliminaries were going on, he laid down on a bench, crossed his arms and legs and then said:

"A. . . . I went to raise up and it felt like somebody was holding, like somebody pushing me in my chest. So I got myself up like I had to throw up so then I sat down.

"Q. That was about how much longer after you had eaten the orange . . .?

"A. Well, I guess ten or fifteen minutes—maybe more than that, I don't know."

He told his trainer, who was beside him, "Gee, I got a headache." His vision was blurry at times, and he told one of his trainers, and also appellant, that he had a headache. He said he first noticed Loughery, upon the latter's appearance in the dressing room, when he sat up. He was asked the question:

"Q. Had you ever had a headache before?

"A. Not before . . .

"Q. Had you ever had a headache in your dressing room before the fight?

"A. No, I have had them after a fight.

"Q. And what did Mr. Loughery say to you about your headache?

"A. He asked me and he said, 'Harold, do you want me to call a doctor?' He said, 'The doctor is right over there.' I told him, 'No, Tom, I'll be all right.' "

He said Loughery remained with him for probably 20 minutes, and that during that time the headache got worse and he began to feel a little heavier, and that his dizziness increased. He had testified to sit-

ting with his head in his hands and was asked this question:

"Q. Was this an unusual position?"

And he answered:

"A. *An unusual headache,* not the position. . . ."
(Italics supplied.)

After spending 20 minutes with Mr. Loughery in the dressing room, he said he again saw him later, two or three minutes before he went into the ring. At that time he said, "I felt a little groggy and had the headache". He said he thought his manager went with him into the ring. Before going up to the ring, he said he almost fell, that he caught himself against the shoulder of Skinny Davidson, one of his trainers. He said before the fight he was "moping around" and that he is usually pretty spry before a fight. The witness also said that he couldn't shadow box, that he tried and was unable. He was asked this question:

"Q. You did tell him (Davidson) you had a headache. Well now, we have your testimony that you did tell him you had the headache and you were sluggish?

"A. *He could see that because he had been with me for fifty-eight fights that I have had.*

"Q. And you almost fell?

"A. Yes, I did.

"Q. Do you remember going into the ring?

"A. Yes, I do.

"Q. Do you remember that you stumbled?

"A. Yes, I remember that." (Italics supplied.)

The witness said that as he entered the ring, he was dizzy and that he remembered his trainers sitting him down and putting ice on his neck. This was even before the first round started. He said he was getting progressively worse, that his legs and arms felt heavy. He said, "My trainer and Mr. Gross picked me up, or something". With respect to being introduced from the ring, he was asked this question:

"Q. Do I understand from that, that you couldn't arise from the chair by yourself?"

And he answered:

"A. *That is what they tell me, I don't remember.*" (Italics supplied.)

The witness then said that he had no recollection at all of what took place in the first round or what occurred at the end of the first round. When he was asked if he remembered the second round, he said, *"I don't even remember the first round"*. The next thing he remembered was when he woke up in the hospital. When he was waiting for instructions from the referee, he said, referring to his legs, "They felt as if I wanted to run somewhere and couldn't do it". He also said, with respect to the application of ice, that he never before had had ice put to his head or neck before a fight started. He said he told his trainer, Skinny Davidson, at ringside, *"Skinny, I can't see too good"*. He admitted that he told Davidson, his trainer, "Don't call him (the doctor), I'll be all right". When he was asked why he said this, he answered:

"Well, as a fighter I had been—well, I wouldn't say from the Commissioners or anything—kicked around pretty good. *I had to fight guys that I shouldn't have to fight, big heavyweights, and I couldn't get the fights that I should have had and as many as I should have had. . . .*

"Q. Who arranged them for you, and tell us why you went through with them?

"A. *Well, I have one reason, I don't have a job, if you know what I mean.*" (Italics supplied.)

There clearly is an implication in this testimony that Johnson thought he had to go through with the fight no matter how he felt and that it was useless to have a doctor look at him. He describes in his testimony how in a previous fight with one Clarence Henry

he was fined $2,500 for not going through with the fight and for assigning as a reason that he had been injured in a fight just two weeks previous. He said that right before the fight, *"it felt like if I didn't grab ahold of somebody I was going to fall down, that's the way it felt"*. The witness said that he didn't feel like doing anything. He said, *"The way I felt is just like climbing out of the ring and going home and lay down, that's the way I felt"*. He said he didn't want to take chances of getting suspended by complaining.

The testimony of appellant throws a great light on his knowledge of Johnson's apparent condition prior to the fight. He said:

"A. I went back to the Arena . . . *Harold was lying down* and Joe was here (to his right) . . . I reached over to Harold and said, 'How are you feeling, Harold?' He said 'I got a slight headache Tom; I got a slight headache'. He said, 'But I'll be all right'. *So I am sitting there thinking, thinking.* So Davidson comes in with Joey White, who had his eye cut. The doctor came right in after him and I reached over to Harold and I said, 'Harold, here's the doctor. Maybe he'll give you something. I'll ask him; I'll tell him'. Harold said, 'No, don't bother; I'll be all right'. So, the doctor was there and he fixed up Joey White and he went. I went outside *after trying to get some talk out of Harold*. I know he had a headache; he told me he had a headache, the slight headache, and he wouldn't let the doctor look at him. So I didn't know what else; he was *lying down in the dumps*. I goes out and I see Lou Gross. I said, 'Lou, do me a favor, will you?' He said, 'What, Tom?' I said, 'Go in and say hello to Harold; talk with him and give him a pep talk, *because he seems like he's all down in the dumps*'. Lou did go in to Harold and he talked with him—I don't know how long—and he comes out, and he says, *'Say, Tom, I don't know what is the matter. He does seem like he*

*is down in the dumps.* I don't know'. So, from then on, I don't know, I guess I was worried about this and that—." (Italics supplied.)

Appellant admitted that prior to the fight, in addition to telling him that he had a slight headache, Johnson also said that he was sick at his stomach. He was asked this question:

"Q. Do you remember telling him (Inspector Driscoll) . . . 'I come in and I go back into the dressing room and *Harold is lying down.*' Do you remember telling him that?

"A. *Yes; that's no lie.* . . .

"Q. 'So I sat with Harold for 5 minutes.' Is that correct, you told him that?

"A. Yes.

"Q. 'And he was lying down.'

"A. He was lying down. . . . *He wasn't just himself. You could see that.*" (Italics supplied.)

With respect to whether or not appellant was at the ringside, he answered, in reply to a question:

"A. . . . So, the bell rang and they went to the corner and Harold Johnson goes over. I thought in that first round he didn't look himself and *he shouldn't have went the first round.* I'm no doctor, I don't know. . . . (Italics supplied.)

He later testified:

"A. I spoke to Mr. Gross. . . .

"Q. Where?

"A. Outside of the dressing room.

"Q. In the aisle leading to the Arena?

"A. . . . That's the time I asked him would he please do me a favor, to go and talk to Harold, because *'Harold looks like he's down in the dumps. I don't know what's the matter with him.* Please go in and talk to him'. After that the only conversation I had with him

—he come out and he passed some remark: *'He does look bad,'* or something. I just don't remember what the words was." (Italics supplied.)

This conversation took place in the aisle close to the arena.

At another point in his testimony he said:

"A. I sit there with Harold, as I tell you, and *he didn't talk; he just looked funny*—he didn't talk. I tried to get a little talk out of him. So I went out and saw Mr. Gross. I said, 'Lou, will you do me a little favor—'because I had hired him to go in Harold's corner that night; he was to go in the corner. So I said: 'Lou, I want you to do me a favor.' He said: 'What?' I said: 'Go in and give Harold a pep talk. He don't look good; *he looks groggy or something. He's down in the dumps'*—that's the word I used, *'He's down in the dumps.'*

"Q. When did you first realize, if you did, that Harold should not have been in the ring?

"A. *That was after that, when I believe he was going down toward the first in the ring; he kind of stumbled or something, which I thought he did. I don't know whether he stumbled or not.*" (Italics supplied.)

On top of all this testimony, this question was put to him:

"Q. Do you remember Mr. Klein asking you the question: 'To get back to the night of the fight—and I will close on this—*you were aware, weren't you, prior to the time when Johnson went into the ring that he was not in fit shape?*' and your answer: *'Yes, I thought so, yes, and I would have went and got someone else to look him over.'* Do you remember that?

"A. *Yes, that's right, that's right. I thought Johnson was not fit to get in that ring, and I'll say that again, again and again; he should have been in the hospital, not in a ring.*

"Q. Did you see Mr. Klein before the men went into the ring?

"A. Mr. Klein? I believe I passed him coming down the walk, I believe I was coming this way and he was going toward the ring, I believe that was it.

"Q. Do you remember him asking you a question: 'Where are you going?'

"A. What did I say?

"Q. Do you remember him asking you the question?

"A. I think I remember him asking me something, asking me something.

"Q. Do you remember what he asked you?

"A. He said, 'Hello', or 'How are you', or something; I know when we passed he said it.

"Q. Do you remember whether or not he asked you, 'Where are you going?'

"A. I was going nowhere.

"Q. Do you remember Mr. Klein saying this to you: 'I said to you, "Where are you going? *You're going the wrong direction. The ring is that way. Aren't you going to stay for the fight?*" and you said, *'I'm sick and I don't want to see it'*. . . .

"Q. Do you remember that?" (Italics supplied.)

He was asked what he was sick about and he answered, *"I was sick, and I'm sick yet"*. We believe it was apparent from this testimony that appellant was fully aware of the terrible condition in which his fighter then was, and that he knew he was not fit to fight. The realization, we believe, really made him sick, and this was the reason he made the remark the testimony shows he made to Mr. Klein.

In view of this testimony, we have the clinching testimony of the commission's physicians, Drs. Ayella and Strickland, which clearly established that appellant's concern over his fighter's condition was well founded, for it was definitely established that Johnson had been drugged prior to the bout and was in no

fit condition to participate in it. If he knew of this condition, then it could only follow of necessity that any fight in which Johnson partook on that particular night would only have been a sham exhibition and not a real contest. It is true that both Dr. Strickland and Dr. Ayella saw Johnson within the ten minutes immediately preceding the fight. Dr. Ayella did not examine him and had only a brief conversation with him. Dr. Strickland's examination was only perfunctory and consisted solely of taking his blood pressure and heartbeat. He did not then examine his eyes. He inquired as to how Johnson felt and was told "all right". Neither of these two witnesses observed anything unusual in his condition. But within 15 minutes both of them saw an astonishing change in condition, found the fighter disoriented and in a comatose condition. Later tests showed he had undoubtedly been drugged and both doctors said so. As he was removed from the ring, his pupils were 40 percent dilated. We believe neither of these two doctors had sufficient time to observe his real condition and that his prefight examination was only perfunctory. His trainer and his manager, on the other hand, had ample chance to discover his condition and their testimony indicates that they knew he was not fit to enter the ring. This knowledge, without disclosing it to the commissioner, certainly constituted conduct detrimental to the interests of boxing.

Various other contentions have been raised by appellant in this case, but we feel that we can dispose of it without passing upon them. The action of the commission was fully justified, after considering the testimony of record. Among these contentions were that appellant was improperly charged with a violation of section 13 of the Act of June 14, 1923, P. L. 710, as amended, and with a violation of section 17 of the Rules and Regulations of the Pennsylvania State Ath-

letic Commission, that the commission erred in admitting testimony of boxing matches held without the Commonwealth of Pennsylvania, that statements of third persons given at a private police investigation were not admissible against appellant who was not present, and who had no right to cross-examine, that the commission erred in admitting Commonwealth's exhibit C-19, purporting to be a contract signed by appellant without proof of its execution and authentication, and finally that appellant, Loughran, was denied due process of law and a fair hearing because prejudicial and irrelevant testimony was offered by the Commonwealth. Without going into these matters, and assuming that there might in some instances be some merit in these contentions, a careful examination of the whole record before us shows that the commission's ultimate and controlling findings and the order made thereon are not erroneous, arbitrary or capricious, as appellant contends, but on the contrary, are supported by substantial and legally credible evidence. This case with respect to this feature is very similar to the case of State Board of Medical Education and Licensure v. Harney, 60 Dauph. 204, wherein our President Judge Smith, in his opinion, points out that one legally sufficient reason is enough to sustain a board's action, although that action may have been attacked upon other grounds. We therefore make the following

### Order

And now, February 14, 1956, the adjudication of the Pennsylvania State Athletic Commission, made on July 7, 1955, suspending the manager's license, no. 440, issued to Thomas Loughran (also known as Thomas J. and Tommy Loughran) for a period of six months from the date of service thereof, is hereby affirmed and the appeal taken on July 7, 1955, is herewith dismissed.