## Vitagraph, Inc.'s, Application.

Argued December 4, 1928. Before MOSCHZISKER, C. J., FRAZER, WALLING, SIMPSON, KEPHART, SADLER and SCHAFFER, JJ.

*Morris Wolf,* with him *Abel Cary Thomas,* for appellant.—The Commonwealth and the lower court seem to have confused entirely the question of the supremacy of the censors within the jurisdiction given to them and their discretion as to an enlargement of that jurisdiction.

Beyond the discretion committed to it, the board has no discretion at all and an attempt to extend jurisdic-

tion beyond that committed to the board is not an abuse of discretion but a perfectly void attempt to usurp power: Gemas's License, 169 Pa. 43; English's License, 59 Pa. Superior Ct. 621; Cambria Co. Brewer's License, 78 Pa. Superior Ct. 40; Com. ex rel. v. Phila., 176 Pa. 588; Com. v. Shaffer, 52 Pa. Superior Ct. 230; Fuel City Mfg. Co. v. Products Corp., 268 Pa. 441; Waite v. Macy, 246 U. S. 606.

The Act of 1915 is to be strictly construed: Com. v. Quaker City Cab Co., 287 Pa. 161; Com. v. Kebort, 212 Pa. 289; Com. v. Exler, 243 Pa. 155; Greene Co. v. Surety Co., 292 Pa. 304.

The authority to approve or disapprove titles exists solely and exclusively because, and only to the extent that, the titles form part of the film. If the language on the titles did not form part of the film, it would be no more subject to censorship by the board than if the action shown on the pictures were duplicated by living actors.

*John Robert Jones,* with him *Thomas J. Baldrige,* Attorney General, for appellee.—Upon appeal from the decision of the board declining to approve a motion picture, the sole inquiry is whether the board acted arbitrarily, unreasonable and in such a way as to amount to an abuse of discretion: Goldwyn Distributing Corp., 265 Pa. 335.

There can be no question as to the power of the board to do all of the things which are necessary for the performance of the duties imposed upon it and no broader language could be employed than that of "examination, approval or disapproval, and regulation." To contend that the written and printed word is censorable, and the spoken word is not, in the light of the language and purpose of the Act of 1915, is to argue against the known facts of human experience and to contend for an absurdity.

474

OPINION BY MR. JUSTICE FRAZER, February 4, 1929:

Appellant, known as Vitagraph, Inc., appeals from a decree of the Common Pleas Court of Philadelphia sustaining an order of disapproval by the State Board of Censors of a motion picture play film, intended for public exhibition and in which picture spoken language forms a feature and part. Appellant filed its application with the board as directed by the Act of May 15, 1915, P. L. 534, by which that body was established and under the provisions of which it functions. It also filed, as required by the same law, a series of views of the play, but refused to submit, for the board's examination, language to be spoken during the course of proposed exhibitions of the picture. Thereupon the board issued its order of disapproval of the film submitted. After a rehearing, appellant again declined to submit the language, and a final order of disallowance of the film for exhibition purposes was issued, from which an appeal was taken by appellant to the court below. After hearing, that court entered judgment dismissing the appeal and affirming the action of the Board of Censors.

This case differs, only in the matter of methods employed for the original production and for the later reproduction at public exhibitions of spoken words to be used at such exhibitions, from the case of Fox Film Corporation above, see page 461. Our interpretation there of the Act of 1915 and the legal principles involved, apply equally to the present controversy, with respect to the right of the Board of Censors to require submission to it for approval or disapproval of spoken language to be used in a motion picture intended for presentation before the public. In both cases the spoken words constitute a salient part and feature of such picture; but the processes for producing the utterance of the words and for rendering the tones of the speaker audible to an audience, differ. In the Fox Film Corporation Case, the words and tones were recorded upon

the film. In the present instance, they are produced by means of an apparatus similar to the ordinary phonograph, the words and sounds being recorded on the record or disk. They are rendered loudly audible by means of sound amplifiers, and, by the use of coördinating devices, the language and voice tones are heard by the audience simultaneously and in coördination with the movements of the speaker's lips as his figure appears upon the screen. Thus it will be noted that the synchronization of words and voice with the action of the lips of the actor is in effect the same in both cases, and the result on the screen practically identical.

Precisely the same basic question arises here that governed the Fox Film case: Has the Board of Censors, within the scope of the intent and purpose of the Act of 1915, authority to require submission to it for approval or rejection of spoken language to be used as a part of a motion picture intended for public exhibition? In the Fox case we held that such spoken language, which in that case was reproduced from recordation upon a film, came within the regulation of the board requiring such submission. In the present case a film is not used to produce the spoken words, but by the aid of processes other than a film the language and the voice of the actor are heard as part of the picture play during its exhibition to the public.

We held in the Fox case that the intent of the Act of 1915 could not, if the legislative purpose was to be attained, be so narrowly limited as to confine the censorial supervision of the board only to the scenic or "silent views" of a motion picture intended for public display and to exempt from that supervision spoken language recorded upon a film and used in the same picture. But the "sound film" is not, as the facts in the present case prove, the only means by which spoken language in motion pictures are rendered perceptible to the hearing of an audience. Certainly a similar result is achieved by the phonographic apparatus, as utilized

by appellant here. We are of opinion that the manner and method of reaching that result are not elements necessarily material to a proper determination of the question here involved. It is within the range of probability, in presence of the extraordinary inventive genius of our time, that still other means and methods, more or less intricate, will be developed and come into use for public presentation of motion picture plays in which spoken language forms an actual part. But even then the ultimate purpose and result will be the same as now, namely, to hear the words and the voice of the actor uttering them as he appears upon the screen. What, is really material for a true and common sense interpretation of the provisions of the Act of 1915, embodying the legislative intent and aim, is that the Board of Censors shall have actual knowledge of the language and its meaning intended to be used in a motion picture to be presented at public exhibitions, the scenic views of such picture may be wholly excellent. Its spoken parts, no matter by what kind or variety of mechanism produced to the hearing, may be exactly what the law forbids they shall be—sacrilegious, indecent, immoral. No one will question that the legislature, in the exercise of the police power of the state, may forestall and prevent, by remedial statutes, the perpetration of such offense against the canons of public morals. This is precisely the purpose and object of the Act of 1915, which created the Board of Censors and delegated to that body supervisory powers, to be exercised within the line of its duties, as its judgment and discretion should direct. Of course, this discretion so delegated is not to be understood as judicial discretion, but such discretion as may be expected from persons well qualified by education and experience to act as censors under the act and to know what are the common standards of morality which the act seeks to protect (Goldwyn Distributing Corp., 265 Pa. 335, 341) and likewise qualified to intelligently decide whether

a motion picture, intended for public exhibition, contains and embraces, as a whole or in part, spoken language, as well as scenic or "silent views," that would, by such public presentation, lower or tend to lower and debase the public mind and morals.

In the case at hand, appellant twice refused to submit the spoken language to the examination of the board. The language was admittedly a part and feature of the proposed exhibition, and as such came within the intent and purpose of the Act of 1915 and was subject to censorial supervision. No mandate of the act frees a motion picture from such supervision if proposed to be exhibited to the public, with the exception, as set forth in section 29 of the Act of 1915, that its provisions do not apply to the exhibition of films for purely educational, fraternal or religious purposes. Being unable, by reason of appellant's refusal to submit a part of the picture in this case, the board could not examine it in its entirety, and thus, having no other alternative, they properly disapproved it as a whole. Consequently, the censors, finding themselves unable to gain knowledge of the spoken words, and, in bona fide exercise of their discretion, refused approval of the motion picture here in question, they did nothing more than what was their duty within the scope of the purpose and intent of the law.

The judgment of the lower court is affirmed at appellant's costs.

Mr. Justice KEPHART dissented.