## Fox Film Corporation's Application.

462

Argued December 4, 1928. Before Moschzisker, C. J., Frazer, Walling, Simpson, Kephart, Sadler and Schaffer, JJ.

*John Robert Jones,* with him *Thomas J. Baldrige,* Attorney General, for appellant.—The act creates an

administrative board: Franklin Film Mfg. Corp., 253 Pa. 422.

The court, in so far as the present issue is concerned, is considering a remedial statute which is "to receive a liberal construction so as to accomplish the legislative purpose: Com. v. Shaleen, 215 Pa. 595; Goldwyn Distributing Corp., 265 Pa. 335.

Upon appeal from the decision of the board declining to approve a motion picture, the sole inquiry is whether the board acted arbitrarily, unreasonably, and in such a way as to amount to an abuse of discretion.

*Owen J. Roberts,* with him *Charles A. Wolfe* and *Robert T. McCracken,* for appellee.—A consideration of the language of the Act of May 15, 1915, P. L. 534, and a comparison of this act with the prior Act of June 19, 1911, P. L. 1067, clearly shows that the legislature intended to commit to the board the censorship of pictures only and not of spoken language, music or sound: Com. v. Kebort, 212 Pa. 289.

Since the words of the Act of 1915 are plain and clearly define its scope and limit, its provisions cannot be extended by construction: Martin v. Baldy, 249 Pa. 253; Grayson v. Aiman, Inc., 252 Pa. 461; Citizens Pass. Ry. v. P. S. C., 271 Pa. 39.

OPINION BY MR. JUSTICE FRAZER, February 4, 1929:

This controversy has arisen over the refusal of the Pennsylvania State Board of Censors to approve, for public exhibition purposes, a motion picture film proposed to be displayed on a motion picture screen by the Fox Film Company, appellee here. The company made application to the board for approval of the film upon which was a recordation of spoken language, such application being a requirement of the Act of May 15, 1915, P. L. 534, by which law the board was created and vested with authority to exercise designated administrative duties and powers for regulation of and control over

films to be used in public exhibitions of motion pictures within this Commonwealth. Previous to this application, the board, in conformity with the right conferred upon it by the act, to adopt reasonable rules necessary to carry out and enforce the purposes of the law, placed the following regulation upon its application blanks: "State whether or not this film is to be exhibited in conjunction with any mechanical device, or by the use of persons, for the utterance of language. If so, submit such language." The film company admitted in its application that spoken language would be so used, and added: "Upon advice of counsel, we refuse to submit such language upon the ground that this requirement is beyond the authority of the board and......or the discretion of the board." Thereupon the Board of Censors made an order of disapproval, claiming that without a knowledge of the language proposed to be uttered in connection with the motion picture intended for public exhibition it was unable to determine whether or not the film was moral or improper, in conformity with the provisions of the Act of 1915. Upon appeal to the board by the film company from this order, a rehearing was granted, appellee again refused to submit the words of the film and a final order of disapproval was issued from which the film company appealed to the Court of Common Pleas No. 1 of Philadelphia. After evidence and argument heard, that court, in a written opinion, set aside the final order of disapproval by the board and sustained the appeal of the film company. From that decree the controversy is brought here.

The several assignments of error are directed against various conclusions of the court below, and we shall dispose of them in our general consideration of the material questions involved.

We may say at the start, that this dispute centers around an actual film upon which there is a recordation of the words of a song and the tones of the singer, both to be, as admitted by appellee, reproduced by mechani-

cal devices in public exhibitions of a motion picture play. In a statement by appellee to the board, it is thus explained: "The motion picture will be projected upon the screen in the same manner as other motion pictures are projected and the song will be sung and played upon the piano by [the actor] and reproduced simultaneously with the projection of the picture in synchronization with the motion of [his] lips and his acting while singing and playing the song. The recordation and reproduction of the voice and the piano accompaniment, which are amplified in synchronization with the motion picture, are accomplished by means of a combination of electrical and mechanical processes which record said sound on the film and reproduce said sound by means of processes involving sound amplification."

Reduced to their simplest terms, the contention of appellee and the finding of the court below are that, since the Act of 1915 makes no reference to spoken language films, or "sound films," as they are designated in the cinema world and in public advertisements of motion picture exhibitions, the Board of Censors is without authority to interfere with the use of the sound film, although it is to form a feature and part of a public presentation of a motion picture play. The learned trial judge in his opinion reversing the order of disapproval, holds that the board "has no jurisdiction whatsoever to compel the submission to it for examination of such language as is to be used in conjunction with a moving picture film." This conclusion however, is not an adequate statement of the gist of the real issue involved here. The basic and controlling question for determination is: Is the exercise of censorial powers of the Board of Censors over sound film, that is, spoken language films, to be displayed at public exhibitions, within the scope of the intent and purpose of the Act of 1915? If those powers are thus within that scope, it follows, of course, as a legal consequence, that the board acted within its authority in requiring submis-

sion to it, for examination, of the film which appellee refused to submit.

A reference here to the provisions of the act will be helpful. The title embodies a particularly comprehensive and inclusive range of powers under which the board may act, setting forth that the act is one "relating to motion picture films, reels, or stereopticon views or slides; providing a system of examination, approval, and regulation thereof; and of the banners, posters, and other like advertising matter used in connection therewith; creating the Board of Censors; and providing penalties for the violation of this act." A recital of the powers of the board, as applicable to the case before us, is given in section 6 as follows: "The board shall examine or supervise the examinations of all films, reels, or views to be exhibited or used in Pennsylvania; and shall approve such films, reels, or views which are moral and proper; and shall disapprove such as are sacrilegious, obscene, indecent, or immoral, or such as tend, in the judgment of the board, to debase or corrupt morals." The compulsory submission of a film to the Board of Censors is expressed in section 24 in this language: "Every person intending to sell, lease, exhibit, or use any film, reel, or view in Pennsylvania, shall furnish the board, when the application for approval is made, a description of the film, reel, or view to be exhibited, sold or leased, and the purposes thereof; and shall submit the film, reel, or view to the board for examination."

The learned court below concedes, that the authority conferred upon the Board of Censors by the above-quoted sections of the law extends to the supervision of picture films, or "silent films," and also over the titles and subtitles shown upon a screen, but declares that the regulation of the board requiring submission to it for examination of appellee's sound film "is an obvious attempt to extend its jurisdiction beyond that conferred upon it by the legislature." The Board of Censors is,

as we have said in Franklin Film Mfg. Corp., 253 Pa. 422, 426, and in Buffalo B., M. F. Co. v. Breitinger, 250 Pa. 225, an administrative body, created by the legislature with discretion and authority to determine facts. It is trite to say that these facts are to be determined for a definite purpose. Vitalizing every law, especially those laws which deal with the well-being of the people of an entire commonwealth, there is an ultimate purpose, a supreme result, to be attained. But a statute of such large range and important policy may not be expected to itemize in full detail all the sources from which may come the evils it is designed to prevent nor set forth in equal detail all methods it allows to be employed. Within the scope of its intent and design it must possess a kind of universality of application and, for the proper administration of justice under it, the spirit as well as the letter of the law must be recognized. It is in this light that the Act of 1915 must be interpreted and its provisions applied, as was done in Stull v. Reber, 215 Pa. 156, with the Act of June 18, 1895, P. L. 156, excluding children from the public schools if not vaccinated. There a child, who was in good health, was so excluded, even though no smallpox existed in her neighborhood and had not appeared there for forty years. In that case we said (page 163) : "The act is not a penal statute. It is a broad general act relating to the health of the whole population of the Commonwealth. It is not, therefore, to be construed or administered by the rigid technical rules applicable to penal laws, but fairly according to its intent, neither narrowing it to the letter, to the exclusion of cases clearly within such intent, nor stretching it beyond its legitimate scope, to cover matters not clearly meant to be included. It is an act touching very closely common rights and privileges and therefore specially requiring a common sense administration."

The learned court below grants the Board of Censors authority under the act, to supervise and prevent public

468

exhibitions of silent or picture films, but claims the
board extends its exercise of power beyond that con-
ferred upon it by law, in seeking to supervise the sound
film. We can recognize this distinction only by the
establishment of the fact, by proper proof, that a "sound
film," such as appellee refused to submit to the exami-
nation of the Board of Censors, is a thing so distinctly
and intrinsically separate and apart from the object
which the Act of 1915 designates as a "motion picture
film," that it is fundamentally a new creation, and is
not in fact a film. But, such conclusion would lead
into the realm of absurdity, in the face of the fact,
admitted by appellee, that what it refused to submit
for examination was a film of that sort. It is a truth
of general knowledge that the film constitutes the basic
thing in the making and public exhibition of motion
pictures. But to know what a film is, for the pur-
poses of the just administration of the Act of 1915,
we are not required to delve through an incrustation
of technical terms, since the act gives in simple words
its own definition of the term. In section 1 it declares
"that the word 'film' used in this act means what is
usually known as a motion picture film." The phrase,
"motion picture film," has become definitely incorpo-
rated into the English language, is a household phrase,
and, as such, its meaning and application are to be taken,
by direction of the law itself, in the usual customary,
ordinary and familiar sense in which it is employed
by the general public. Upon what ground then, may it
reasonably be claimed that the film, admittedly to be
used in public exhibitions which appellee would not
submit to the board for examination, is not within
the definition of the Act of 1915? Appellee answers,
because upon it is a recordation of spoken words and
because the act makes no mention of spoken language.
But it is unescapably true that the act makes no classi-
fication of films, sets forth no distinction as to kind
or sort, except the sole distinction of quality—whether

films are proper or improper, in the judgment of the Board of Censors, for public exhibition. The comprehensive and inclusive nature of the act is emphatically displayed by its own words. The board is to examine and approve or disapprove "all" films to be used for public purposes; it shall note in its records "all" films it has examined; and any member or employee of the board may prevent the exhibition of "any" film not duly approved by the board, and "every" person intending to exhibit "any" film shall first submit it to the board for supervision. These words are broadly comprehensive and inclusive in their scope of meaning and application. They include collectively, and without right of selection or differentiation, each and every projection of a motion picture, in its entirety, upon a screen, the projection having its source from what is generically designated in the Act of 1915 as a "film"; and wherever in this Commonwealth it is intended to use the film in public exhibitions, it must be, previous to the proposed exhibition, submitted to the Board of Censors for approval or disapproval. It will of course be generally conceded that without the film there could, in the present development of cinema productions, be no motion picture displayed nor appearance of the shadow actor upon the screen; and the evidence and technical statements contained in the record of the present case compel an equally conclusive acceptance of the fact that, until some other and far more different processes and devices than those now in use are invented, the "sound film" or the "talking film," must be and remain, exactly what it is, a film. A striking proof of the acceptance of this fact by the experts of the cinema world and the producers of motion pictures at public exhibitions is presented, as may be seen by easy observation, in the many advertisements in newspapers and cinema trade publications, by the very general use of the terms "sound films," "speaking films" and "talking films."

Viewed then from a common sense standpoint, which we think no sensible technical explanations will weaken, the recordation of spoken language upon a film constitutes merely a recordation differing in matter and kind from that on a "silent film" and designed to reach the hearing of an audience instead of its sight or vision. It is thus only an incidental, variant style or kind of film, and thus comes within the scope of the meaning and application of the generic term "film," as used in the Act of 1915. It is immaterial whether or not the sound film constitutes an entire "talking picture," or is only a part or feature of it; the purpose and result of each are identical—its projection upon the screen for public or private exhibition. When such sound film, whether part or the whole of the speaking or singing elements of a motion picture, is to be used for public exhibition, it necessarily comes within the reach of the provisions of the Act of 1915 which require, before the proposed exhibition, its submission to the Board of Censors, for their examination, approval or disapproval.

In our opinion, there is no force or validity in the argument of the court below that since the movietone processes of producing spoken language films had not been invented, and accordingly were not in use, at the time of the enactment of the law of 1915, the sound film, such as is in controversy here, was not within the contemplation of the legislature when the law was enacted and that consequently the Board of Censors is without supervisory power over it. The act is expressed in general language, is prospective in its application and purpose, and, containing no express restrictions, applies to all cases that come within its terms and its general aim. It is a rule of statutory construction that legislative enactments in general and comprehensive terms, prospective in operation, apply alike to all persons, subjects and business within their general purview and scope coming into existence subsequent to their passage: 25 R. C. L. 778. This rule of

construction was followed in Commonwealth v. Quaker City Cab Company, 287 Pa. 161, where it was claimed that taxicab companies not being expressly mentioned in the Act of June 1, 1889, P. L. 420, were not accordingly within the scope of the legislative intent, and that since taxicabs were unknown at the time of the enactment of that law, such vehicles would necessarily be free from its provisions. We said there: "Here the language [of the act] is plain. True, taxicab companies are not mentioned, for the obvious reason that in 1889 there were none. But the statute is prospective and expressed in broad language, so as to embrace such companies when formed and operated as common carriers." See also Newman v. Arthur, 109 U. S. 132.

The order of the Board of Censors, disapproving the film here in question, was not an arbitrary exercise of its discretion but was entirely within the provisions of the Act of May 15, 1915.

Decree of the lower court is reversed at costs of appellee.