## In re "Spain in Flames"

*Louis E. McCabe*, for appellant.
*Maxwell E. Seidman*, for appellee.

LEVINTHAL, J., November 24, 1937.—This is an appeal from the order of the Board of Censors disapproving the motion picture "Spain in Flames".

The film depicts a few of the signal events of the present Spanish insurrection, set against a briefly sketched background of royal Spain and the birth of the republican government. The scenes shown are actual, not acted, the film consisting of a series of newsreels. Accompanying

the film is a sound track, devoted in part to a presentation of Spanish speeches by prominent loyalists, but consisting in the main of amplification, explanation, and comment upon the significance of the pictorial part of the film. Several English subtitles translate the more salient portions of the speeches. Typical of the statements in the sound track and subtitles are the following:

"The Fascists, with superior Italian and German planes, tanks and guns, swept the people's army back on Madrid."

"The Fascists deliberately shell and bomb crowded residential sections to break the spirit of the people."

"We shall never forget the Fascist generals, the bombs and the bullets, the foreign allies of the generals."

"Long live Democracy! Down with Facism!"

"In the famous fortress of Alcazar, army men of Toledo who have joined the Fascist revolt against the legal government entrench themselves."

It will be seen that many of the lines are factual, others interpretive, and several hortatory. However, the board has regarded all alike. The order of disapproval provides, in effect, that if the words "Fascist", "Nazi", "Italian", "Rome", "German", "Berlin", and the like, be deleted wherever they appear, the picture will be approved.

The Act of May 15, 1915, P. L. 534, as amended by the Act of May 8, 1929, P. L. 1655, reads:

"The board . . . shall approve such films, reels, or views which are moral and proper; and shall disapprove such as are sacrilegious, obscene, indecent, or immoral, or such as tend, in the judgment of the board, to debase or corrupt morals. This section shall not apply to . . . films or reels containing current news events or happenings, commonly known as news reels, which are not in violation of the provisions of this section."

Censorship, under our theory of government, is presumptively bad and is tolerated only as a necessary evil. It is needless for us to dilate upon the reasons influencing us to think censorship undesirable, for we have been

brilliantly anticipated by a great galaxy of liberal thinkers. Milton, Mill, Jefferson, and Holmes have spoken for us. We, like them, are confident that the popular good sense will ultimately discover and prefer truth and that the general welfare can best be served only by a free expression of opinion. As Mr. Justice Holmes, dissenting in Abrams et al. v. United States, 250 U. S. 616, 630 (1919), wrote:

". . . when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas—that the best test of truth is the power of the thought to get itself accepted in the competition of the market, and that truth is the only ground upon which their wishes safely can be carried out. That at any rate is the theory of our Constitution. It is an experiment, as all life is an experiment. Every year if not every day we have to wager our salvation upon some prophecy based upon imperfect knowledge. While that experiment is part of our system I think that we should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death, unless they so imminently threaten immediate interference with the lawful and pressing purposes of the law that an immediate check is required to save the country."

Moreover, it must not be forgotten that a censorship which today may be used to curb our enemies' opinions may be utilized tomorrow to suppress our own most treasured convictions.

However much we prize liberty, we must value democracy no less. The General Assembly of the Commonwealth of Pennsylvania—representative of the people— has found censorship desirable, and the courts have frequently sustained this expression of the popular will as not in violation of our Constitutions: Mutual Film Corp. v. Industrial Commission of Ohio, 236 U. S. 230 (1915) ; Buffalo Branch, Mutual Film Corp. v. Breitinger, 250 Pa.

225 (1915). We respect the will of our lawmakers, the opinion of our law interpreters, and the judgment of those to whom the discretion vital to the administration of censorship has been entrusted. Therefore, the question which we must determine is not whether we should have ordered the elimination of any word of the sound track or subtitles of "Spain in Flames", were we the censors, but whether the action of the board was within the scope of its authority under the statute, and, if so, whether the present exercise of such authority was in excess of the board's proper discretion.

Considering the last-mentioned problem first and assuming, for the moment, that "Spain in Flames" lies within the jurisdiction of the board, should the instant censorship be upheld? There is no serious contention that the film is "sacrilegious", "obscene", or "indecent". It is, however, argued that the word "proper" appearing in the provision of the statute requiring approval of certain films, and the word "immoral" used in the clause providing for the disapproval of certain objectionable pictures, give additional scope to the board's discretion and justify the order here complained of. The word "proper" has been held to be limited and defined by the more specific terms used in the act, our Supreme Court having declared that "every order for an elimination made by the board of censors necessarily comprehends a finding that the picture in question is 'sacrilegious, obscene, indecent, or immoral', and, as such, tends to 'debase or corrupt morals' ": In re Franklin Film Mfg. Corp., 253 Pa. 422, 427 (1916). This construction is necessary, for a broader interpretation permitting the board to censor films, guided by an undefined standard of *propriety*, would, we believe, have rendered the statute to that extent unconstitutional, on the ground that "the boundaries thus set to the freedom of speech" would be "vague and indeterminate", allowing the play of arbitrary action, contrary to "the guarantees of liberty embodied in the

Fourteenth Amendment": Herndon v. Lowry, Sheriff, 301 U. S. 242, 264 (1937).

If, therefore, "Spain in Flames" were subject to censorship, the order of the board would have been sustainable not upon the ground that the terms "Fascism", "Nazis", "Germans", "Italians", etc., and the contexts in which they were expressed, were "improper", but only on the ground that they were "immoral". Even though we discern no immorality in any of the dialogue and subtitles, and assuredly no immorality so great as the suppression of free speech, we feel that the board, in directing the elimination of the disapproved words and phrases, would not have acted capriciously or arbitrarily. Our Supreme Court has said:

"The only question raised on . . . appeal was whether the board of censors, in disallowing the reels and films submitted, had exercised an honest discretion or had unreasonably and arbitrarily rejected them": In re Goldwyn Distributing Corp., 265 Pa. 335, 342 (1919). See also In re Franklin Film Mfg. Corp., supra.

Morality is an ample and inclusive concept. In it is comprehended more of the realm of customary good and evil than that portion concerned merely with sexual problems. There is no abuse of discretion in barring as immoral what the Governor of Pennsylvania has termed "recruiting propaganda": 144 The Nation 396 (1937). Inflammatory slogans such as "Forward against world Fascism!" may lead to, and may have been intended to lead to, the violation of our Federal neutrality legislation and to illicit volunteering. This, together with the arousing of hatred against foreign powers and the fanning of war spirit thereby engendered, might reasonably have been considered as immoral, and immoral within a relatively objective standard.

If the board's order were within its jurisdiction, we should be loath to assume our own infallibility and to substitute our standard of morality for that of the board. Every reasonable doubt must be resolved by us in behalf

of the administrative action, lest we arrogate to ourselves the functions of legislator and administrator. We are mindful that Mr. Justice Stone recently felt compelled, in a dissenting opinion, to say of courts that "the only check upon our own exercise of power is our own sense of self-restraint. For the removal of unwise laws from the statute books appeal lies not to the courts but to the ballot and to the processes of democratic government. . . . Courts are not the only agency of government that must be assumed to have capacity to govern": United States v. Butler et al., etc., 297 U. S. 1, 79, 87 (1936).

It is, therefore, only because we are of the opinion that "Spain in Flames" is not within the jurisdiction of the board's censorship powers that we sustain this appeal. "Spain in Flames" is a film "containing current news events", and therefore it is "not within the provisions of this" statute. The pictorial part of the film is certainly news, and "current news". The British Board of Censors has suggested, in defining the word "current", that ' "The event need not be current at the time when the film is shown if it was current at the time when it was taken" ': The Film Censor's Report for 1933, 98 Just. P. 551 (1934). The Attorney General of New York apparently shared this view when he said the test "is whether or not they depict scenes taken from actual happenings": Report of Attorney General (N. Y., 1926) pp. 162, 163. He thus stressed the actual or fictional quality of the pictures rather than their age. This construction, however, is not wholly tenable. We think the events shown must "be timely. . . . The current events of yesterday are the history of today": Report of Attorney General (N. Y., 1934) pp. 358, 359. In the main, the events and happenings composing "Spain in Flames" are timely and of continuing interest, since the Spanish rebellion is still current. As for the film's introduction, sketching the character of pre-republican Spain, it is merely a necessary preface of comparative brevity.

"To be of proper value educationally, and to present the news event in its true light, some pictorialization from actual past events, directly associated with the 'current' event portrayed, may be permitted": Report of Attorney General (N. Y., 1934) pp. 368, 369.

As for the sound track and subtitles, it is obvious that that portion thereof in which is narrated the story of the events of the Spanish rebellion is news. It is well settled that the recordation of spoken words, incidental to an ordinary motion picture, is embraced within the terms "film" or "reel" for the purpose of censorship: Fox Film Corporation's Application, 295 Pa. 461; Application of Vitagraph, Inc., 295 Pa. 471 (1929). Thus, by parity of reasoning, the sound track incidental to a news reel, and which itself narrates news, cannot be censored. There are, it is true, three gratuitous rallying cries of the narrator, one of which we have repeated above, which are not strictly accounts of current happenings. However, the entire picture, its subtitles and sound effects, even though there be an occasional detail bred of imagination rather than observation, *contains* current happenings and comes within the general description of "newsreels", and therefore is exempt from censorship.

In our opinion, this view is inescapable. Narration and subtitles are even more essential to newsreels than are headlines and editorials to newspapers. To censor the accompaniment is to nullify the protection accorded the picture itself, for without explanation and comment it is devoid of meaning. To forbid the narrator to tell his audience that the troops shown on the screen are Italians or Fascist Moroccan mercenaries is, in effect, to forbid the portrayal of what actually did occur. Our legislature has wisely exempted the newsreel from all interference. Its wisdom has been recognized by other States, such as New York and Kansas, which had previously permitted the censorship of newsreels, but which now exempt such films. See James N. Rosenberg's article, Censorship in

292

the United States, 32 Law Notes 49, 53 (1928) ; The Legal Aspect of Motion Picture Censorship, 44 Harv. L. Rev. 113, 115, n. 24 (1930).

The recent development of pictorial news periodicals, of picture pages and sections in newspapers, and of theatres devoted primarily to the display of newsreels, all attest the important and vital role of pictures as a medium of information, opinion, and education. "Picture-journalism" properly has come to be recognized as a responsible and powerful new arm of all journalism. For millions of persons, news pictures are competing actively with the printed word, and to them is properly accorded the same freedom from restraints prior to publication which is enjoyed by the press. Within this freedom, lest it be meaningless, must be encompassed all incidental comment essential to the intelligent understanding of the picture. As a New York court said in another connection, we are "unable to see any practical difference between the presentation of . . . current events in a motion picture film and in a newspaper": Humiston v. Universal Film Mfg. Co. et al., 189 App. Div. 467, 474, 178 N. Y. Supp. 752, 757 (First Department, 1919).

The ordinary fictional motion picture is to a certain extent the outgrowth of the drama of the stage, and the functions of such theatrical performances are primarily to entertain and to provide an escape from reality. Motion picture newsreels, on the other hand, are designed to disseminate information and to portray actuality. Licensing and censorship of theatrical exhibitions had their origin in the days when the theatre was popularly regarded as something low and lewd, and when actors were looked upon as "rogues and vagabonds". A censorship which had such a genesis should certainly not be appied to newsreels, which perform a service essentially different from that of the ordinary motion picture play. Information is not entertainment merely because both may be presented upon the same screen.

It should be noted that there is no abuse of privilege here. We are not confronted with a lengthy fictional film in which is interpolated a short newsreel sought to be utilized as a basis for exempting the entire picture. Every scene in "Spain in Flames" is life itself. Although it is a full-length picture, running for approximately 1¼ hours, it has no dramatic plot or climactic sequence. The greatest part of the sound track merely repeats what every newspaper has written for months. The few words which are not news are so incidental that they must be regarded as not altering the nature of what is so predominately a newsreel.

Nor need we anticipate abuse of the exemption of newsreels from censorship. The narrator is no more likely to inject falsehood and misinformation into the lines supplementing a newsreel than is the newspaper reporter to weave fact with fancy. The producer of a newsreel should not be subjected to censorship from which the most venal publisher of a newspaper is free. See, for an example of the vicious kind of newspaper protected from censorship, Near v. Minnesota ex rel., 283 U. S. 697, 724, n. 1 (1931).

We feel that if the statute were more narrowly construed as to the exemption of newsreels, than we have here construed it, there would be doubt as to its constitutionality. It is true that more than a decade ago there was judicial approval of newsreel censorship. See Pathé Exchange, Inc., v. Cobb et al., etc., 202 App. Div. 450, 195 N. Y. Supp. 661 (3d dept., 1922), affirmed without opinion, 236 N. Y. 539, 142 N. E. 274 (1923) (Cardozo, J., absent). Newsreels were later expressly exempted from the New York Censorship Act, New York Laws, 1927 Ch. 153, sec. 28, 16 McKinney's Consolidated Laws of N. Y. §1083. Inferentially, the United States Supreme Court has not regarded the newsreel as presenting a special problem, in passing upon the constitutionality of motion picture censorship generally, the point not being at all discussed in its opinions. See Mutual

Film Corp. v. Industrial Commission of Ohio, supra, Mutual Film Corp., etc., v. Hodges, etc., 236 U. S. 248 (1915), and Rosenberg's Censorship in the United States, supra. However, as we have indicated, the rôle of the newsreel has become much more significant in recent years, and it should be noted that the United Sates Supreme Court has become increasingly zealous in its protection of civil liberties. Thus, Mr. Justice Roberts said only a few months ago, in Herndon v. Lowry, sheriff, supra, at page 258:

"The power of a state to abridge freedom of speech . . . is the exception rather than the rule and the penalizing even of utterances of a defined character must find its justification in a reasonable apprehension of danger to organized government. The judgment of the legislature is not unfettered. *The limitation upon individual liberty must have appropriate relation to the safety of the state.* Legislation which goes beyond this need violates the principle of the constitution." (Italics supplied.)

In view of these words and of decisions such as Near v. Minnesota, supra, the Supreme Court would not be without precedent in holding that the constitutional provisions guaranteeing due process of law and freedom of speech protect one's right to urge, even through a motion picture amplifier, "Down With Fascism!"

We have considered it necessary to set forth our opinion at considerable length in order to discuss adequately the various contentions argued before us, and to avoid any misunderstanding of the reasons which have motivated us in deciding this case, involving as it does principles basic to our system of government.

The appeal from the order of the Board of Censors is sustained, and the board is hereby directed to approve "Spain in Flames" in the form in which it was originally submitted.

---

NOTE.—An appeal from the foregoing decree was taken to the Supreme Court but was withdrawn.