## In re The Ramparts We Watch

438

*William Clarke Mason*, for appellant.

*Claude T. Reno*, Attorney General, *George J. Barco*, Deputy Attorney General, and *Abraham J. Levy*, for respondents.

PER CURIAM, September 30, 1940.—This is an appeal from the final order, dated September 20, 1940, of the Pennsylvania State Board of Censors, relating to a motion picture called "The Ramparts We Watch". This order required the elimination in its entirety of the portion of the reel containing a German-made film called "Baptism of Fire", including all scenes and accompanying speeches.

A hearing has been held in the matter, and the court has viewed the motion picture in its entirety, including the deleted portion.

It appears that prior to this final order the picture known as "The Ramparts We Watch" met with no objection from the Board of Censors, but the film that had been submitted to the board did not contain the German-made film "Baptism of Fire". After the film submitted had been approved, appellants obtained a German-made film purporting to portray actual scenes of the German conquest of Poland, with accompanying language manifestly intended and used by the Nazi régime in Germany as propaganda designed to disseminate Nazi doctrines and to induce other peoples into submitting to German domination, or to the adoption of the Nazi ideology. Appellants substituted this film for a portion of the picture "The Ramparts We Watch" without the approval of the board, and upon reviewing by the board of the film, with the substitution, the board ordered the deletion of the German-made film "Baptism of Fire" from the motion picture "The Ramparts We Watch". The reason given by the board in its final order, and upon its records, for the refusal of approval was that the deleted portion "has a tendency to corrupt and debase morals; and is not proper".

The Administrative Code of April 9, 1929, P. L. 177, as amended by the Act of June 1, 1931, P. L. 350, sec. 409, creates a board of three residents and citizens of Pennsylvania "well qualified by education and experience to act as censors of motion-picture films . . .". The Act of May 15, 1915, P. L. 534, as amended by the Act of May 8, 1929, P. L. 1655, makes it unlawful to exhibit motion pictures unless approved by the board, and provides that the board "shall approve such films, reels, or views which are moral and proper; and shall disapprove such as are sacrilegious, obscene, indecent, or immoral, or such as tend, in the judgment of the board, to debase or corrupt morals". It further provides that this section shall not apply to "films or reels containing current news events or happenings, commonly known as news reels . . .".

We do not conceive that we are to act as a super-board of censors, but rather to determine whether the board in this case abused the discretion vested in it or acted arbitrarily or capriciously in making its order. The State, in the exercise of its police power, has delegated the protection of public morals in the matter of the exhibition of motion pictures to the State Board of Censors. As was said by the Supreme Court in Vitagraph, Inc.'s, Application, 295 Pa. 471, 476:

". . . this discretion so delegated is not to be understood as judicial discretion, but such discretion as may be expected from persons well qualified by education and experience to act as censors under the act and to know what are the common standards of morality which the act seeks to protect (Goldwyn Distributing Corp., 265 Pa. 335, 341) and likewise qualified to intelligently decide whether a motion picture, intended for public exhibition, contains and embraces, as a whole or in part, spoken language, as well as scenic or 'silent views', that would, by such public presentation, lower or tend to lower and debase the public mind and morals."

The inquiry that arises here starts with the presumption that the board acted within the reasonable scope of its power and discretion, and the burden is on appellants to show affirmatively that its decision was made on a ground not involving the exercise of its discretion: In re Goldwyn Distributing Corp., 265 Pa. 335, 342.

Appellants in this case failed by any competent testimony or evidence to meet the burden placed upon them to show affirmatively that the decision of the board was made upon a ground not within the exercise of its discretion, or that it had abused its discretion or acted arbitrarily or capriciously.

The film "The Ramparts We Watch," aside from the interpolated section known as "Baptism of Fire," depicts the every-day life of the people of this country prior to the first World War, our preparation for entering it, and our entry into that war. Cuttings from old silent films

showing happenings prior to 1920 are strung together upon a slender thread of story. Without any logical sequence to the picture, and although it has no relation to the story in the main picture, there is inserted in it the German film "Baptism of Fire," which we are given to understand appellant obtained in some manner from Canadian authorities, who seized it as contraband, with the explanation that it was made by German authorities for propaganda purposes, to be exhibited to people whom they proposed to conquer and for the purpose of threatening them and terrifying them. Its showing implies direst penalties carried out in conquered territory against loyal citizens of that territory, and rewards to the traitors of that territory for such treacherous services, commonly called "fifth column activities," as they have been able to render to Hitler. The final part of the "Baptism of Fire" reel shows a Hitler agent denouncing Americans and threatening them in the most insulting and aggravating terms. The right of an exhibitor to subject the citizens of Pennsylvania and the American people generally, who have paid their admission fees to be entertained or enlightened, to such abuse might well be questioned.

The appellants make the point that none of these things may be deemed to corrupt or debase morals—which is the ground upon which the board relied for its action. The word "morals" is variously defined, but probably the most concise definition may be found in Webster's New International Dictionary. There we learn that the word "morals" has as its root a Latin word which stands for manner, custom, habit, way of life, conduct. The Hitler pagan propaganda depicts a way of life which, fortunately, is not ours. Its way of life is entirely egocentric and therefore completely selfish. It believes that if the strong even sympathize with the weak they waste strength and power; that the weak are useless and should be eliminated rather than helped; that might is right; and it has no place in its philosophy for the consideration of others. It believes that Christian humility is weakness, and that selfish bru-

tality is the only power. It believes in a totalitarian state administered by a dictator in supreme command. Against this we have our American way of life which is built on altruism; we succor the weak; we recognize the brotherhood of man and the Fatherhood of God; we do not kill for the mere lust of it; we think that only right makes might, and we are proud of our democratic form of government. To spread propaganda which brutal men believe will instill terror in the hearts and minds of women and children can serve no useful purpose to the American way of life. To depict a man in the character of a German hurling insults at our American citizenry could only serve a god of hatred, in contrast to our God of Love. It would tend to stir up strife and resentment, resulting in possible attack upon some innocent American citizens of German descent.

Appellants also contend that this is a newsreel and thus exempt from the jurisdiction of the Board of Censors. We can find nothing in the evidence before us, or from our viewing of the picture, to justify this contention. The picture "The Ramparts We Watch" is based upon a fictional theme concerning events which happened prior to 1920. To give the story some semblance of reality, as said before, clippings from old films, showing actual scenes prior to that date, are inserted. Then the "Baptism of Fire" portion is interpolated. It contains alleged scenes of the German invasion of Poland in September of 1939. Since that time Germany has invaded, in chronological order, Denmark, Norway, Holland, Belgium, and France. The invasion of Poland is not news now, and the scenes shown are not "current news events or happenings, commonly known as newsreels", as defined in the act. Furthermore, the film is not presented as a newsreel but as a feature picture. Appellants apparently did not regard it as a newsreel prior to its disapproval by the board because they submitted it for approval incorporated in a

feature picture. Had they regarded it as a newsreel they could, under the terms of the act, have taken the responsibility of exhibiting it as such without the board's approval.

We furthermore find no abridgment of the freedom of speech in the board's disapproving of the propaganda which we have reviewed. As was said by Mr. Justice Roberts in Herndon v. Lowry, Sheriff, 301 U. S. 242, 258 (1937), the "limitation upon individual liberty must have appropriate relation to the safety of the state." In this war-torn world today the Board of Censors could well find reasonable apprehension of danger to organized government and safety of our State in the provocative utterances and scenes contained in the deleted film. A great portion of the world is presently at war. The flames of the conflagration fortunately have not reached us, but the scorching heat has already begun to be felt in this country, a country to which the people of many of the nations now at war have come to enjoy freedom and peace and to live under a representative democracy; and our administrative bodies are justified in using every legal and reasonable effort to preserve our peaceful existence and to encourage the coöperation of the various racial elements of our population in the furtherance of the common weal and the preservation of our institutions and economy.

We do not conceive it our function to substitute our judgment for that of the board, but to merely determine whether the board acted arbitrarily or abused the discretion vested in it. From our viewing of the film and our examination of the record we can find nothing to indicate that the board acted arbitrarily or abused the discretion vested in it, but, on the contrary, are convinced it acted reasonably and for the public welfare, and that its decision was within the scope of its discretion.

We, therefore, dismiss the appeal at the cost of appellants.