# Stern et al. v. Pennsylvania Liquor Control Board

*A. J. Levinson,* for complainants.

*Horace A. Segelbaum,* Deputy Attorney General, for respondent.

HARGEST, P. J., Chancellor, July 28, 1947.—This is a bill in equity to restrain the Pennsylvania Liquor Control Board from enforcing the provision of the Liquor Control Act, as amended by section 1 of the Act of May 21, 1943, P. L. 332, 47 PS §744-602, so far as it applies to the operation of television devices in places licensed by the Liquor Control Board.

The matter was submitted by bill, answer, and testimony taken, and presented by agreement to the court in banc on final hearing.

The bill avers that plaintiffs hold restaurant liquor licenses and conduct restaurants in the city of Philadelphia, and that they maintain radio and television devices which enable observation of images upon a television system. The bill recites the provision of the statute and the regulation issued by the Liquor Control Board, and asks for an injunction restraining the board from enforcing the regulation.

The answer avers that the images transmitted over the air by the application of the principle of electronics

are images of objects and persons in motion projected upon a screen and are moving pictures within the meaning of the statute.

There is no substantial conflict as to the facts.

### The Statute

The statute provides that "It shall be unlawful for any licensee, except club licensees, to permit, in any licensed premises, . . . dancing, theatricals or floor shows of any sort, or *moving picture exhibitions* other than such as are exhibited through machines operated by patrons, by the deposit of coins, . . . unless the licensee shall first have obtained from the board, a special permit to provide such entertainment; . . ."

The board is authorized to charge an annual license fee of not less than $25, and violation of the provision is punishable by penalties, including the suspension or revocation of the license.

Pursuant to this act, the Liquor Control Board, on or about March 1, 1947, adopted a regulation reciting that television devices are within the statute above quoted, and "Therefore, all retail liquor and malt beverage licensees, except clubs, are hereby officially notified that the use of television devices in their licensed establishments . . . is unlawful unless the licensee is a holder of a valid amusement permit."

### Facts

Plaintiffs operate on their premises what is commonly known as a radio and television device. The device portrays on a screen, at present about 7½ by 7½ inches, races, baseball games, prize fights, other sporting events, and occasionally moving pictures, by a system of electronics.

To illustrate: A baseball game may be electrically produced on what is called an iconoscope and transmitted to what is known as a kinescope, located in the

hall or restaurant where it is to be seen, and there the images are transformed and thrown upon the screen.

The experts describe "television" as "seeing at a distance by electrical means."

In the receiving device the tube is mounted so that an image or scene can be focused on to a flat plane located in the back of the tube and transmitted to the plate by an electron gun. This gun is a source of a fine pin-point beam of electrons which impinges on the plate on which the image is focused. The beam of electrons is caused to move from left to right across the plate on 525 lines in one thirtieth of a second. The length of time required for the spot or beam of electrons to traverse the plate on one line is sixty three one millionths of a second. The rapidity of the electronic action is what reproduces the movement of the baseball game or prize fight, upon which the instrument is first centered, and that is transmitted in detail to the receiving instrument and, when seen, disappears forever. The activity, whether a prize fight, a show, or moving picture, is seen instantly and simultaneously with the activity, whatever it may be.

The difference between a television and moving picture is that the moving picture has been captured on a film, which may be repeatedly produced; whereas the image in a television device is seen once and cannot be repeated, unless something like a moving picture, which is permanent, is televised.

### Question Involved

The precise question is whether television broadcasts or reception by television devices constitute "moving picture exhibitions" within the meaning of the statute.

### Discussion

This is a case of first impression, and its decision is not without difficulty.

We approached the case having in mind certain rules of interpretation.

In Commonwealth v. Cartwright, 350 Pa. 638, it is held:

"When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning."

And as held in Green v. Penna Milk Control Commission, 340 Pa. 1:

"The power and authority to be exercised by administrative commissions must be conferred by legislative language clear and unmistakable; a doubtful power does not exist."

But another rule of construction confronts us, namely, "The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the Legislature." Statutory Construction Act of May 28, 1937, P. L. 1019, sec. 51, 46 PS §551.

In Commonwealth v. Lowe Coal Co., 296 Pa. 359, 367, it is stated:

"A 'primary rule of construction . . . is that, in applying a statute, the first duty of the court is to ascertain and give effect to the intention of the legislature' (Vonot v. Hudson Coal Co., 285 Pa. 385, 392-3), and, when 'necessary . . . to effectuate a plain legislative intent, . . . additional . . . words may be interpolated.' "

So it is our duty to ascertain the legislative intent. The word "television" does not appear in the statute, but our task is to decide whether "moving picture exhibitions" include television.

In the absence of any judicial definition of "television" we resort to the dictionary. Webster's New International Dictionary (second edition) defines it as "Vision at a distance; hence, the transmission and re-

production of a view or scene, especially a view of persons or objects in motion, by any device which converts light rays into electrical waves and reconverts these into visible light rays."

A "motion picture" is defined as "A series of pictures, usually photographs taken with a special camera, a motion picture camera, presented to the eye in very rapid succession, with some or all of the objects in the picture represented in successive positions slightly changed, and producing, because of the persistence of vision, the optical effect of a continuous picture in which the objects move."

An "image" is defined as "An imitation, representation, or similitude of any person, or thing, sculptured, drawn, painted, or otherwise made perceptible to the sight; a visible presentation; a reproduction; a likeness; a thing actually or seemingly reproducing another."

When one sees on the screen a television reproduction it would be, in a large measure, the same sight as if that same activity were taken by a moving picture and produced upon the screen, except that, under the present stage of development, the screen for the reproduction of the televised activity is much smaller than the moving picture screen.

The device, according to the testimony of the expert, used in television is called "a television camera"; and, according to the testimony of the expert the fundamental difference between television and motion picture exhibitions is that one is permanent for the life of the film and the other "is gone forever" when seen.

Motion pictures are sometimes televised, and the expert admits that when a motion picture is shown on a television set the same picture appears on the television set as would be seen in the motion picture.

Plaintiffs lay stress upon the mechanics of the production. In our opinion, the stress must be placed

upon what the observers in the licensed places see, rather than how the thing seen is produced.

The statute is an exercise of the police power, clearly intended to regulate what is seen or done in the premises of the licensees, under the supervision of the Liquor Control Board.

And, in passing, we do not overlook that a moving picture exhibition produced from a film has been first submitted for approval to the Pennsylvania State Board of Censors, whereas no censorship could be first applied to television exhibitions of prize fights, football or baseball games, and the like; but the exercise of the police power could be applied to a licensee who violates the proprieties by improper exhibitions, even though there is no prior censorship. So that we are of opinion that it is not a determining factor that the one may be first censored and the other not.

In determining the legislative intent we are not without some assistance from decided cases.

In Harrisburg Soundies, Inc., v. Pennsylvania Liquor Control Board, 53 Dauph. 437 (1942), this court held that, under the statute as it then read, a panoram machine, operated by the insertion of a coin, into which the operator looked to see a reproduction of a picture, sometimes accompanied by music, was a motion picture exhibition. The legislature, however, promptly amended the statute to exclude exhibitions "exhibited through machines operated by patrons by the deposit of coins."

There are a number of cases in which a statute has been applied where the language has not specifically included the object of the application.

As early as 1885, in the case of Commonwealth v. Pennsylvania Telephone Co., 2 Dauph. 57, Judge Simonton, in an exhaustive opinion, held that the Act of June 7, 1879, imposing a gross receipts tax upon telegraph companies, made telephone companies liable

to taxation, although at the time of the passage of the act telephone companies were practically unknown.

In Pennsylvania Telephone Co. v. Hoover, 24 Pa. Superior Ct. 96, 99, 209 Pa. 555, the decision was put upon the ground that "a telephone company is a telegraph company within the meaning of the Act."

In a number of other cases it was held that "legislation relating to telegraph was sufficiently comprehensive to cover telephones": Cochranton Telephone Co. v. Public Service Commission, 70 Pa. Superior Ct. 212, 215; Perry County Tel. & Tel. Co. v. Public Service Commission, 265 Pa. 274, 277; Commonwealth v. New Castle Electric Co., 11 Dist. R. 389; People's Tel. & Tel. Co. v. Turnpike Road, 199 Pa. 411; Central Pa. Telephone Co. v. Wilkes-Barre & West Side Ry. Co., 1 Dist. R. 628, 529; York Telephone Co. v. Keesey, 5 Dist. R. 366, 369.

In Commonwealth v. Hawkins, 14 Dist. R. 592 (1905), President Judge Frazer held that an Act of 1868, which, of course, was passed long before automobiles were operated, authorized the city, by ordinance, to impose a license fee upon automobiles. He said:

"Under authority of the Act of 1868 an ordinance was passed by councils, and approved Sept. 28, 1882, requiring 'each and every wagon, cart, car, dray or private carriage drawn by one horse' to pay a license fee of $6, and for vehicles drawn by two horses $10 per annum. This ordinance has been in effect for almost twenty-five years. . . . The city having power to impose a license fee upon 'every description of carriages,' is that language broad enough to include automobiles? While automobiles are not specifically named in the Act of Assembly, they are certainly carriages. . . . That they were unknown when the Act of 1868 was passed, is not material. If they are carriages 'of any description,' the city has the right to regulate and

license them, . . . An automobile being essentially a carriage, we know of no reason why such vehicles should be exempt from license and regulation when other 'carriages' are subject to the same."

In Commonwealth v. Quaker City Cab Co., 287 Pa. 161, the Hawkins case, just referred to, was cited and quoted from with approval. In the Quaker City Cab Co. case the question was whether a taxicab company was a "transportation company" within the meaning of the Act of June 1, 1889, P. L. 420, imposing a tax on the gross receipts of such companies. In deciding this case holding that the taxicab company was a transportation company, this court held (29 Dauph. 90) :

"*Statutes, framed in general terms, apply to new cases that arise and to new subjects that are created, which come within their general scope and policy.*"

The Supreme Court used this pertinent language, page 165:

"A statute should be construed primarily by its language and the legislature is presumed to have used words in their ordinary signification: . . . Here the language is plain. True, taxicab companies are not mentioned, for the obvious reason that in 1889 there were none. But the statute is prospective and expressed in broad language so as to embrace such companies when formed and operated as common carriers. 'A general law may, and frequently does, originate in some particular case or class of cases which is in the mind of the legislature at the time, but so long as it is expressed in general language the courts cannot, in the absence of express restrictions, limit its application to those cases, but must apply it to all cases that come within its terms and its general purpose and policy."

It will be noted that the legislature "is presumed to have used words in their ordinary signification."

So we must use them as the legislature understood them and not as the experts for plaintiffs interpret them.

The court also, page 167, referring to the position that the words "every other company" should be confined to companies of like character, said:

"The rule, as a general proposition, is sound, but a taxicab is not of a nature so substantially different from the instrumentalities expressly mentioned as to be excluded therefrom. For example, a street car and a taxicab each carries passengers for hire, each uses the public streets and whether the motive power is gasoline or electricity, or whether it travels on a fixed track or on the general pavement, is not of controlling importance; *both are devices for the accomplishment of the same end.*" (Italics supplied.)

We think this language is directly in point. A moving picture exhibition is a device to enable the patrons of licensed places to see the images captured on the film. The television exposure is precisely the same thing, namely, to enable the patrons to see what might have been captured on a film but which is brought to the screen directly from where the activity is taking place. So far as the patrons are concerned, "both are devices for the accomplishment of the same end," namely, to see what was done.

While televising a moving picture the operation may start with the film, but it ends with a display on the screen, as transitory as a television exhibition of any other sort. In either instance, what the patron sees is fleeting.

In Fox Film Corporation's Application, 295 Pa. 461, it was contended "that since the Act of 1915 makes no reference to spoken language films, or 'sound films,' as they are designated in the cinema world and in public advertisements of motion picture exhibitions, the Board of Censors is without authority to interfere

with the use of the sound film, although it is to form a feature and part of a public presentation of a motion picture play." The lower court upheld the contention. The Supreme Court reversed, and said, page 470:

"*Viewed then from a common sense standpoint, which we think no sensible technical explanations will weaken,* the recordation of spoken language upon a film constitutes merely a recordation differing in matter and kind from that on a 'silent film' and designed to reach the hearing of an audience instead of its sight or vision. It is thus only an incidental, variant style or kind of film, and thus comes within the scope of the meaning and application of the generic term 'film', as used in the Act of 1915. It is immaterial whether or not the sound film constitutes an entire 'talking picture,' or is only a part or feature of it; *the purpose and result of each are identical—its projection upon the screen for public or private exhibition.* . . .

"The act is expressed in general language, is prospective in its application and purpose, and, containing no express restrictions, applies to all cases that come within its terms and its general aim." (Italics supplied.)

Here again we may repeat the language of the Supreme Court: "The purpose and result of each (moving picture exhibition and television) are identical," namely, to afford a visual exhibition to the patrons of the licensed places.

In Vitagraph, Inc.'s, Application, 295 Pa. 471, in which the process of applying the spoken words was somewhat different, the court came to the same conclusion. It said, page 476:

"*We are of opinion that the manner and method of reaching that result are not elements necessarily material to a proper determination of the question here involved.* It is within the range of probability, in presence of the extraordinary inventive genius of our

time, that still other means and methods, more or less intricate, will be developed and come into use for public presentation of motion picture plays in which spoken language forms an actual part. But even then the ultimate purpose and result will be the same as now, namely, to hear the words and the voice of the actor uttering them as he appears upon the screen." (Italics supplied.)

And, in referring to the police power of the Board of Censors, the court said:

". . . the scenic views of such picture may be wholly excellent. Its spoken parts, no matter by what kind or variety of mechanism produced to the hearing, may be exactly what the law forbids."

So, we repeat that it is the effect produced, namely, the scenic exhibition, which, so far as the patrons are concerned, is precisely the same, except for the size of the screen; and it does not matter "by what kind or variety of mechanism" the same is produced. In both instances it is what to the ordinary individual would appear to be a moving picture.

It is difficult to determine why the legislature would intend that moving or motion pictures should bear the burden of a license requirement, and a more diversified entertainment by television devices would be exempt, since both devices are for the accomplishment of the same end, namely, the visual entertainment of patrons.

In Lowry's Estate, 314 Pa. 518, it is held:

"Where a statute does not itself define a word it uses, that word must be given its ordinary legal signification."

In Fox Film Corporation's Application, supra, page 468, the court said:

"The phrase 'motion picture film,' has become definitely incorporated into the English language, is a household phrase, and, as such, its meaning and appli-

cation are to be taken, by direction of the law itself, in the usual customary, ordinary and familiar sense in which it is employed by the general public."

In Commonwealth v. Wark Co., 301 Pa. 150, 156, the court said:

"We may certainly assume that the legislature in using the word 'manufacturing' in the Act of 1889 and its amendment had no thought of oddities or strained meanings; and no accepted rule of interpretation supports the idea that a court of law may attribute a meaning to a word in a statute, when there is nothing to show or indicate that such meaning was intended by the legislature that enacted the law."

Applying these principles, we may say that in this discussion it was difficult to avoid the use of the words "moving picture" to express in ordinary language what the television exposure does. We find that the experts have had the same difficulty.

In the twenty-seventh annual report of the Radio Corporation of America, (defendant's exhibit No. 1), we find this language on page 8:

"Color television *pictures*, produced by all-electronic means, were demonstrated publicly for the first time on October 30, 1946. . . . The *pictures* in natural colors were viewed on a 15x20-inch screen.

"The achievement of this universal system of television, which transmits and receives both color and black-and-white pictures with equal quality, is . . . revolutionary. . . .

". . . Simultaneous blending of three colors—red, blue and green—is accomplished to produce a perfectly natural picture." (Italics ours.)

And on page 15 a picture has been described as "Infra-Red lamps dry the fluorescent screens of kinescopes, or television picture tubes, while they are being processed."

The language also, at another place, refers to "A projection type television receiver utilizing a 5-inch picture tube."

We are therefore of opinion that the statute is progressive, and the words "moving picture exhibitions" used in it aptly describe a television exhibition.

We are also of opinion that the cases of Infantino v. Quaker City Ins. Co., 155 Pa. Superior Ct. 71; Commonwealth v. Spiers, 51 Pa. Superior Ct. 59, and Commonwealth v. Donnelly, 51 Pa. Superior Ct. 61, relied upon by plaintiffs, are not inconsistent with the conclusion heretofore arrived at.

### Conclusions of Law

1. Television reception, produced by a television device known as a television camera, constitutes a moving picture exhibition within the term "moving picture exhibitions" as used in subsection 14 of section 602 of the Liquor Control Act.

2. The Pennsylvania Liquor Control Board has authority to adopt and issue any regulation controlling the operation of television devices, consistent with the provisions of the Liquor Control Act.

3. The regulation issued by the Pennsylvania Liquor Control Board March 3, 1947, relating to television devices, contained in Bulletin No. A-62, is a valid exercise of the police power.

4. The injunction sought in this case must be refused and the bill in equity dismissed, at the cost of plaintiffs.

### Decree Nisi

And now, July 28, 1947, the injunction sought by Jacob Stern, Philip Sachs, Jack Liss, and Jack London against the Pennsylvania Liquor Control Board is hereby refused, and the bill in equity is hereby dismissed at the cost of plaintiffs; and the prothonotary is hereby directed to give notice to the parties or their counsel of record of the entry of this decree.